OPINION OF THE COURT
David B. Saxe, J.
The plaintiffs own certain premises in which a fire occurred *707 on February 25, 1985. In another action, tenants in that building seek a judgment for $24,000,000, alleging that the landlord’s negligence was a proximate cause of the fire and the attendant damages. In this action, the owners of the premises seek a declaratory judgment resolving a dispute as to the payment obligations of an excess carrier, Home Insurance Company.
The property owners had obtained property and casualty insurance coverage as follows: Public Service Mutual Insurance Company (Public Service) provided primary coverage in the amount of $1,000,000; Mission Insurance Company (Mission) provided the first layer of excess coverage in the amount of $10,000,000; the Home Insurance Company (Home) provided a second layer of excess coverage in the amount of $15,000,000.
The present dispute has arisen because Mission Insurance, the carrier providing the first layer of excess coverage, has been declared insolvent. While the State Liquidation Bureau is prepared to pay a portion of claims due under Mission’s policies, that amount would assertedly total $3,000,000 in this case. This leaves a $7,000,000 gap in the plaintiffs’ insurance coverage, unless the coverage provided by the second-layer excess carrier "drops down” to cover any losses not covered by the other carriers.
The plaintiffs now move for summary judgment declaring that Home’s coverage must, as a matter of law, "drop down” to the point where funds from the prior policies cease. Defendant Home moves for summary judgment dismissing the complaint.
It is the plaintiffs’ position that the Home Insurance policy is ambiguous with regard to its coverage in the event a primary carrier becomes insolvent. I will therefore examine the policy’s language, keeping in mind the applicable rules of construction.
The interpretation of an insurance contract lies with the court (Zodiac Enters. v American Broadcasting Cos., 81 AD2d 337, 339 [1st Dept 1981], affd 56 NY2d 738); its terms must be construed reasonably and practically (Government Employees Ins. Co. v Kligler, 42 NY2d 863). The plain meaning understandable by the average person is the standard applied by the court (Barash v Insurance Co., 114 Misc 2d 325 [Sup Ct, Nassau County 1982]), and the court must keep in mind the reasonable expectation and purpose of an ordinary business *708 man entering into the insurance contract (Ace Wire & Cable Co. v Aetna Cas. & Sur. Co., 60 NY2d 390). Ambiguities in an insurance contract are to be resolved against the insurer; however, the court should not strain to find an ambiguity where the words have a definite and precise meaning (Breed v Insurance Co., 46 NY2d 351, 353).
The applicable provisions of Home’s policy read as follows: "The [Home Insurance] Company agrees to pay on behalf of the Insured the Ultimate Net Loss in excess of the Underlying Insurance as shown in Item 4 of the Declarations [which lists the Mission insurance policy], but only up to an amount not exceeding the company’s Limit of Liability as shown in Item 3 of the Declarations [i.e., $15,000,000]” (emphasis added). In the policy’s definitions section, "Ultimate Net Loss” is defined as "the amount payable in settlement of the liability of the Insured after making deductions for all recoveries and for other valid and collectible insurance, excepting however the policy(ies) of the Underlying Insurer(s).”
The plaintiffs point to the Home policy’s definition of "Ultimate Net Loss” as the site of the asserted ambiguity. Specifically, they contend that the word "recoveries” and the phrase "other valid and collectible insurance” are susceptible of contradictory meanings.
For instance, they suggest that an amount received from the State Liquidation Bureau in payment on a claim against an insolvent carrier may be viewed as the type of recovery mentioned in the policy’s definition of "Ultimate Net Loss”. Such a construction of the policy is apparently suggested since it would in effect create a "drop down” by the excess carrier: the insolvent carrier’s policy would no longer be considered "underlying insurance” and the amount received from the State insurance agency in payment on that policy would instead be deducted from the insured’s total loss to determine the amount due from Home. Thus, if the claimant’s total loss was $15,000,000, Home would deduct the remaining underlying insurance of $1,000,000 provided by the primary carrier, and then deduct the $3,000,000 "recovery” from the liquidation carrier and would then be liable for the remaining $11,000,000. However, this construction runs contrary to the clear language of the policy.
In the most fundamental provision of the policy, Home agreed to pay the insured’s "Ultimate Net Loss in excess of the Underlying Insurance” (emphasis added). The policy ex *709 plicitly listed Mission’s $10,000,000 policy as underlying insurance. In addition, when listing the types of items deductible from the ultimate amount for which Home agreed to be liable, the policy specifically excepted "the policies of the Underlying Insurer(s)”. These essential policy provisions make it clear that the only loss Home was to pay was loss beyond the amount provided for by the underlying policies. There is no rational way that an amount paid by the State insurance agency pursuant to the underlying insurance policy can be deemed a "recovery” when "the policies of the underlying insurers” are specifically excluded from consideration as a "recovery” by the very policy clause which concerns such recoveries.
I further reject the plaintiffs’ construction of the words "valid and collectible insurance”. They suggest that since Mission is insolvent its policy is "invalid” and that since Mission is unable to pay, its insurance is uncollectible except to the extent that the State insurance agency pays out on the claims. This argument is made in an attempt to create a "drop down” by removing an insolvent insurer from the "underlying insurers” and including payment made on its policy as "other valid and collectible insurance”. However, here too I look to the policy as a whole, with the referred-to phrase taken in context, and conclude that there is no ambiguity here.
To determine the amount of the loss for which Home would be liable, the policy provides that Home should deduct the amount of the underlying insurance coverage, and in addition deduct for "other valid and collectible insurance, excepting however the policies of the underlying insurers.” There can be no doubt from these words that "other valid and collectible insurance” was specifically intended not to apply to the specified underlying policies. This conclusion was reached when similar policies were examined in Pergament Distribs. v Old Republic Ins. Co. (128 AD2d 760, 761 [2d Dept 1987]) and in Mission Natl. Ins. Co. v Duke Transp. Co. (792 F2d 550, 554 [5th Cir 1986]; see also, Holland v Stanley Scrubbing Well Serv., 666 F Supp 898, 901 [WD La 1987]). Indeed, the clarity with which the Home policy excludes the underlying insurance from being treated as any other form of recovery may be contrasted with one Massachusetts case in which drop down by the excess carrier was required (see, Massachusetts Insurers Insolvency Fund v Continental Cas. Co., 399 Mass 598, —, n 3, 506 NE2d 118, 120, n 3 [excess policy provided that if underly *710 ing limit of liability was reduced, "this policy becomes excess of such reduced limit of liability”]).
In further support for the conclusion that Home’s policy was only intended to cover the insured’s loss once the loss exceeded $11,000,000, I note that Home’s second-layer excess liability premiums of $6,000 for $15,000,000 excess coverage were substantially lower than those paid for Public Service’s primary coverage (a $76,527 premium for $1,000,000 coverage) and Mission’s first-layer excess coverage ($17,000 for $10,000,000 coverage). This circumstance reflects the reduced risk all parties understood the outer-layer insurers to be assuming and further supports the conclusion that no insolvency drop down was intended.
In the absence of an ambiguity in the policy, no drop down is warranted. This court has previously held that "[insolvency and/or unidentifiability [of a primary insurance carrier] do not create liability on the part of the excess insurer” (St. Vincent’s Hosp. & Med. Center v Insurance Co., 117 Misc 2d 665, 668 [Sup Ct, NY County 1982, Saxe, J.]). The excess insurer first becomes liable when the limits of the underlying insurance have been exceeded; its coverage is only activated when the loss exceeds the amount specified in the underlying policies (see, American Re-Insurance Co. v SGB Universal Bldrs. Supply, 141 Misc 2d 375 [Sup Ct, NY County 1988]). Were the courts to impose upon excess insurers the risk of an underlying insurer’s insolvency, it would, in effect, "transmogrify the policy into one guaranteeing the solvency of whatever primary insurer the insured might choose” (Continental Marble & Granite v Canal Ins. Co., 785 F2d 1258, 1259 [5th Cir 1986]).
Moreover, the statutory creation of a Security Fund to pay claims unpaid due to the insolvency of a carrier (see, Insurance Law § 7603), and the fact that this Fund is subsidized by contributors from insurance companies based upon premiums collected, indicates that the Legislature intended the Fund, not any excess insurers, to pay such claims.
In view of the foregoing, the motions are decided as follows: plaintiffs motion for summary judgment is denied and defendant Home’s cross motion for summary judgment is granted to the extent of declaring that the terms of the Home Insurance excess policy are clear and unambiguous and do not require Home to "drop down” and provide coverage for a loss of less than $11,000,000.