630 So.2d 759 (1994)
LOUISIANA INSURANCE GUARANTY ASSOCIATION
v.
INTERSTATE FIRE & CASUALTY COMPANY.
Douglas D. GREEN, as Commissioner of Insurance for the State of Louisiana
v.
CHAMPION INSURANCE COMPANY.
No. 93-C-0911.
Supreme Court of Louisiana.
January 14, 1994.
*760 Charles W. Schmidt, Daniel A. Rees, Christovich & Kearney, New Orleans, for applicant.
Thomas E. Balhoff, Carey J. Guglielmo, Judith R. Atkinson, Matthews, Atkinson, Guglielmo, Marks & Day, Sheldon D. Beychok, Beychok & Freeman, Baton Rouge, for respondent.
HALL, Justice.[*]
In this declaratory judgment action, we revisit the question of whether an excess insurer must "drop down" into the position of an insolvent primary insurer. See Kelly v. Weil, 563 So.2d 221 (La.1990); Robichaux v. Randolph, 563 So.2d 226 (La.1990).[1] The *761 relevant parties here are the excess insurer, Interstate Fire & Casualty Company ("Interstate"); the insolvent primary insurer, Champion Insurance Company ("Champion"); and the Louisiana Insurance Guaranty Association ("LIGA"). The precise issue presented is whether Interstate's excess policy provides "drop down" coverage for policyholders insured both by Interstate as excess carrier and by Champion as primary carrier. The district court determined that Interstate's policy provided drop down coverage. Although agreeing with the district court, the appellate court conditioned Interstate's obligation to provide drop down coverage on either the primary insurer (Champion) or the insured being held liable to pay the full policy limits. We reverse.

I.
Interstate issued excess automobile liability policies to a number of insureds for whom Champion issued primary policies. Typically, the policies provided personal injury limits, expressed in terms of split per person/per occurrence limits, as follows: Champion's primary policies provided for underlying limits of $10,000/$20,000, and Interstate's excess policies provided for excess limits of either $25,000/$50,000 or $100,000/$300,000.[2]
On June 5, 1989, Champion was declared insolvent and placed in liquidation, triggering LIGA's statutory responsibility under LSA-R.S. 22:1382 A(1)(a) for claims made by or against Champion's insureds. LIGA and Champion's liquidator each commenced separate declaratory judgment actions against Interstate; each sought a judgment declaring that Interstate's excess policies provided drop down coverage from dollar one and thereby precluded LIGA's statutory responsibility. After these actions were consolidated, LIGA and Interstate filed cross motions for summary judgment. The district court denied Interstate's motion and granted LIGA's motion. In so doing, the district court declared that Interstate was obligated to "pay claims made by or against [Champion's insureds] under its policies ahead of and before LIGA has any obligation to pay."
On Interstate's appeal, the appellate court agreed with the district court's declaration insofar as it found that Interstate's policies provided drop down coverage from dollar one, but disagreed with the district court's declaration insofar as it found that such drop down obligation was unconditional. Louisiana Ins. Guar. Ass'n v. Interstate Fire & Casualty Co., 613 So.2d 210 (La.App. 1st Cir.1992). Construing the loss payable clause contained in the limits of liability provision of Interstate's policy, the appellate court found that this clause conditioned drop down coverage on either the primary insurer or the insured being held liable to pay the full underlying limits.[3] The appellate court thus amended the district court's judgment to reflect that condition and to provide "that the Interstate policy affords drop down coverage from dollar one up to the Champion policy limits in addition to the policy limits of the Interstate policy, but only after Champion or its insured has been held liable to pay the full amount of the Champion policy." Id. *762 at 214. One judge dissented, finding that there was no ambiguity in the policy, read as a whole, and that the majority's interpretation of the policy was unreasonable.
We granted Interstate's writ application to determine the correctness of that decision. 617 So.2d 921 (La.1993).

II.
The drop down issue presented here is whether the excess insurer, Interstate, is liable only for the amount of the insured's loss above the specified underlying primary limits, or whether it is liable to provide drop down coverage and essentially step into the shoes of the insolvent underlying primary insurer, Champion. Kelly v. Weil, 563 So.2d 221 (La.1990). Kelly reaffirms that the controlling consideration in resolving this drop down issue is the language of the excess policy. See Nasello v. Transit Casualty Co., 530 So.2d 1114, 1115 (La.1988).
In Kelly, we canvassed the federal and state jurisprudence on the drop down issue, and, based on the particular policy language, found that most excess policies can be sorted into three categories. Relevant here are the first and second Kelly categories.[4] The first category is comprised of policies which hinge coverage on the "collectibility" or "recoverability" of the primary limits, and thus clearly facilitate drop down coverage. The second category is comprised of policies that describe the coverage as excess of the scheduled underlying limits of primary policies for losses "covered" by such policies. As this second category refers to a fixed, predetermined amount of underlying limits, such policies clearly preclude drop down coverage. See W. McKenzie and H. Johnson, Insurance, 52 La.L.Rev. 525, 530-31 (1992); Lumar Marine, Inc. v. Insurance Co. of North America, 910 F.2d 1267 (5th Cir.1990).
In sorting an excess policy into the appropriate Kelly category, the pertinent policy provision ordinarily is the limits of liability provision since it defines the scope of coverage. See Interco Inc. v. National Surety Corp., 900 F.2d 1264, 1267 n. 4 (8th Cir. 1990) (collecting cases); Highlands Ins. Co. v. Gerber Products Co., 702 F.Supp. 109, 112-13 (D.Md.1988). The Interstate policy's limits of liability provision provides:
LIMITS OF LIABILITY: [1] OUR policy is an excess policy over the PRIMARY INSURANCE. [2] OUR obligation does not extend beyond the limits shown in the DECLARATIONS. [3] WE are not obligated to pay under this policy until the PRIMARY INSURER has paid or has been held liable to pay the full amount of the PRIMARY INSURANCE. [4] WE shall then be liable to pay only such additional amounts necessary to provide YOU with a total coverage under the PRIMARY INSURERS and this policy combined.
Pigeonholing its policy into the second Kelly category, Interstate contends that Kelly is dispositive and drop down is precluded. Stated otherwise, Interstate contends that its policy clearly defines the retained limit in terms of the scheduled underlying insurance as set forth in the declarations page. LIGA counters that Interstate's policy cannot be squeezed into any of the three Kelly categories. LIGA further suggests that those three categories are not all-inclusive and that this policy represents a fourth type.
If Interstate's limits of liability provision stopped after the second sentence, it would fit precisely, as Interstate suggests, into the second Kelly category. Indeed, the dissenting judge recognized this, noting that "[t]he interpretation given by the majority, that Interstate must pay both the primary and excess limits if there is a judgment in excess of the primary limits, is unreasonable in light of the first two sentences." Interstate Fire, 613 So.2d at 214. However, the limits of liability provision contains third and fourth sentences not found in any of the policies we categorized in Kelly. Because of these additional sentences, we agree with LIGA's contention that Interstate's excess policy cannot *763 be squeezed neatly into any of the Kelly categories.[5] Nor have the parties cited, or our research uncovered, any case construing policy language identical to that in the Interstate excess policy under scrutiny here.[6]
The instant case thus hinges on an interpretation of Interstate's excess policy. In our task, we are guided by several elementary principles regarding construction of insurance policies.
An insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Civil Code. Smith v. Matthews, 611 So.2d 1377, 1379 (La.1993); Central Louisiana Electric Co. v. Westinghouse Elec. Corp., 579 So.2d 981, 985 (La.1991). The judicial responsibility in interpreting insurance contracts is to determine the parties' common intent. LSA-C.C. Art. 2045 (defining contractual interpretation as "the determination of the common intent of the parties"); Garcia v. St. Bernard Parish School Bd., 576 So.2d 975, 976 (La.1991) (citing W. McKenzie & H. Johnson, 15 Civil Law Treatise, Insurance Law and Practice § 4 (1986) ("Civil Law Treatise")).
The parties' intent as reflected by the words in the policy determine the extent of coverage. Trinity Industries, Inc. v. Ins. Co. of North America, 916 F.2d 267, 269 (5th Cir.1990) (citing Pareti v. Sentry Indemnity Co., 536 So.2d 417 (La.1988)). Such intent is to be determined in accordance with the general, ordinary, plain and popular meaning of the words used in the policy, unless the words have acquired a technical meaning. LSA-C.C. Art. 2047;[7]Breland v. Schilling, 550 So.2d 609, 610 (La.1989); Capital Bank & Trust Co. v. Equitable Life Assur. Society of United States, 542 So.2d 494, 497 (La. 1989).
An insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion. Lindsey v. Poole, 579 So.2d 1145, 1147 (La.App. 2d Cir.), writ denied, 588 So.2d 100 (La.1991) (citing Zurich Ins. Co. v. Bouler, 198 So.2d 129 (La.App. 1st Cir.1967)); Harvey v. Mr. Lynn's, Inc., 416 So.2d 960, 962 (La.App. 2d Cir.1982) (collecting cases); Jefferson v. Monumental General Ins. Co., 577 So.2d 1184, 1187 (La.App. 2d Cir.1991). Absent a conflict with statutory provisions or public policy, insurers, like other individuals, are entitled to limit their liability and to impose and to enforce reasonable conditions upon the policy obligations they contractually assume. Oceanonics, Inc. v. Petroleum Distributing Co., 292 So.2d 190, 192 (La.1974); Fruge v. First Continental Life and Accident Ins. Co., 430 So.2d 1072, 1077 (La.App. 4th Cir.), writ denied, 438 So.2d 573 (La.1983) (collecting cases); Hartford Acc. & Indem. Co. v. Joe Dean Contractors, Inc., 584 So.2d 1226, 1229 (La.App. 2d Cir.1991) (collecting cases).
Ambiguity in an insurance policy must be resolved by construing the policy as a whole; one policy provision is not to be construed separately at the expense of disregarding other policy provisions. LSA-C.C. Art. 2050;[8]Pareti v. Sentry Indemnity Co., 536 So.2d 417, 420 (La.1988); Benton Casing Service, Inc. v. Avemco Ins. Co., 379 So.2d *764 225, 231 (La.1979) ("one section or its placement is not to be construed separately and at the expense of disregarding other sections or placements"); Hartford, 584 So.2d at 1229 ("[n]o single portion of an insurance contract should be construed independent of the whole, i.e., the policy is to be construed in its entirety").
If after applying the other general rules of construction an ambiguity remains, the ambiguous contractual provision is to be construed against the drafter, or, as originating in the insurance context, in favor of the insured. This rule of strict construction requires that ambiguous policy provisions be construed against the insurer who issued the policy and in favor of coverage to the insured. Smith v. Matthews, 611 So.2d 1377, 1379 (La.1993) (citing Breland, supra). Under this rule, "[e]quivocal provisions seeking to narrow the insurer's obligation are strictly construed against the insurer, since these are prepared by the insurer and the insured had no voice in the preparation." Garcia v. St. Bernard Parish School Bd., 576 So.2d 975, 976 (La.1991). LSA-C.C. Art. 2056 codifies this rule of strict construction, providing that "[i]n case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party." LSA-C.C. Art. 2056; Civil Law Treatise, supra § 4; see also W. Freedman, 2 Richards on the Law of Insurance § 11:2[f] (6th Ed.1990) ("Richards") (noting that the rule of strict construction is also labeled the doctrine of contra proferentum).
"Ambiguity will also be resolved by ascertaining how a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered." Breland v. Schilling, 550 So.2d 609, 610-11 (La.1989). The court should construe the policy "to fulfill the reasonable expectations of the parties in the light of the customs and usages of the industry." Trinity Industries, 916 F.2d at 269 (5th Cir.1990) (citing Benton, 379 So.2d at 231 and LSA-C.C. Arts. 2045, 2050, 2053 and 2054). In insurance parlance, this is labelled the reasonable expectations doctrine. Richards, supra at § 11:2[g].[9]
Yet, if the policy wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written. LSA-C.C. Art. 2046 (providing that when the words of a contract are clear, no further interpretation may be made to determine the parties' intent); Schroeder v. Bd. of Supervisors of Louisiana State University, 591 So.2d 342, 345 (La. 1991); Massachusetts Mutual Life Ins. Co. v. Nails, 549 So.2d 826, 832 (La.1989); Albritton v. Fireman's Fund Ins. Co., 224 La. 522, 70 So.2d 111, 113 (1953). When the language of an insurance policy is clear, courts lack the authority to change or alter its terms under the guise of interpretation. Bernard Lumber Co., Inc. v. Louisiana Ins. Guar. Ass'n, 563 So.2d 261, 263 (La.App. 1st Cir.), writ denied, 566 So.2d 981 (La.1990) (citing Radar v. Duke Transp. Inc., 492 So.2d 532, 533-34 (La.App. 3d Cir.1986)). The determination of whether a contract is clear or ambiguous is a question of law. Watts v. Aetna Casualty and Surety Co., 574 So.2d 364, 369 (La. App. 1st Cir.), writ denied, 568 So.2d 1089 (La.1990).

III.
With these settled principles of construction in mind, we turn to the contractual terms of Interstate's excess policy alleged to support drop down coverage. In reviewing them, we first observe the conspicuous absence in the policy of any provision addressing the problem created by the primary insurer's (Champion's) insolvency. We next observe that the policy repeatedly refers to the fact that Interstate is an excess insurer. The policy is labeled an "Automobile Liability Excess Indemnity Insurance Policy." The insuring agreement states that Interstate *765 "will indemnify [the insured] for LOSS in excess of the PRIMARY INSURANCE." The limits of liability provision likewise states that Interstate's policy is "an excess policy over the PRIMARY INSURANCE." The other insurance provision states that "the insurance afforded by this policy shall be in excess of and shall not contribute with such other insurance." And, the notice to policyholders section provides that Interstate's policy "covers excess limits only ... and only after the limits ... of another insurance company referred to as the primary insurer are fully used and exhausted."[10] The declaration page describes in column I the "UNDERLYING LIMITS OF PRIMARY INSURANCE" and in Column II the "COMPANY'S LIMITS OF LIABILITY (AMOUNT IN EXCESS OF THE PRIMARY INSURANCE LIMIT)." Hence, the Interstate policy, as a whole, is clearly an excess one, agreeing to pay amounts over and above the primary policy limits. See Highlands Ins. Co. v. Gerber Products Co., 702 F.Supp. 109, 111-112 (D.Md.1988) (noting that the word "excess" taken in its ordinary usage means "over and above" and not "down onto").
Acknowledging this, the appellate court stated that "`[a]ll of the provisions of the policy denote Interstate as an excess insurer that will pay after the underlying limits are used or exhausted ...' except the final [fourth] sentence of the `Limits of Liability' paragraph." Interstate Fire, 613 So.2d at 214. Latching onto that one sentence as creating an ambiguity, the appellate court concluded that the sentence was "clearly susceptible to more than one interpretation," including, as urged by LIGA, that "[i]f Champion or its insured is held liable and, for whatever reason, including insolvency, Champion does not pay, the fourth sentence obligates Interstate to stand in for Champion and to pay whatever amounts are necessary to provide the insured with the coverage promised by both the primary and excess policies." Id. at 213. Adopting that construction, the appellate court found that "[t]he agreement by Interstate in the limits of liability section to pay the sums necessary to afford the coverage of both policies is not conditioned on the collectibility of the primary policy. The agreement is merely to pay the sums necessary to afford the combined coverage in a specific situation [contemplated by the fourth sentence]." Id. at 213. The court further found that "[n]othing in any of the other provisions deals with this specific situation or changes the operation of the fourth sentence." Id.
The sole source of potential ambiguity in Interstate's policy, and thus the sole grounds on which LIGA, supported by the appellate court's conclusion, relies in support of drop down coverage is the fourth sentence of the limits of liability provision. LIGA argues that the insured's reasonable expectations, the ambiguity created by the fourth sentence and public policy considerations are all reasons that support affirming the appellate court's construction of the fourth sentence. Alternatively, LIGA suggests that we construe the fourth sentence as a clear, unconditional contractual guarantee by Interstate to pay the combined policy limits.
On the other hand, Interstate argues that the appellate court erred in focusing all of its attention on that one sentence of the policy in isolation and in relying on that sentence to the exclusion of the balance of the policy. Interstate further argues that the appellate court's construction of that sentence is contrary to LSA-C.C. Art. 2050's mandate that contracts, including insurance policies, be construed as a whole. Interstate contends that, construed as a whole, its policy unambiguously precludes drop down coverage.
For the reasons that follow, we agree with Interstate's contention that, construed as a whole, its policy plainly precludes drop down coverage and thus reverse.

IV.
Resolution of this case turns on whether the fourth sentence of Interstate's limits of liability provision requires Interstate to drop down and assume the insolvent *766 primary insurer's (Champion's) obligations. At the outset, we note that though we agree with the appellate court's conclusion that the Interstate policy could have more clearly delineated its payment obligation, "that fact does not mandate the conclusion that the policy was legally ambiguous." Garmany v. Mission Ins. Co., 785 F.2d 941, 945-46 (11th Cir.1986). Stated differently, merely because an insurance policy is a complex instrument requiring analysis to understand it does not render it ambiguous. See LSA-C.C. Art. 2046 (providing that "no further" interpretation, as opposed to no interpretation at all, is required when a contract is clear).
Repeating, the fourth sentence reads: "WE shall then be liable to pay only such additional amounts necessary to provide YOU with a total coverage under the PRIMARY INSURERS and this policy combined." Applying the general rule of construction that words in an insurance contract are to be construed in accordance with their plain and ordinary meaning, we find the words in this fourth sentence reflect that its meaning is dependent upon other policy provisions in at least three respects.
The first dependent word is "then." The word "then" is defined as "[n]ext in ... order." American Heritage Dictionary (1976). In this sentence, "then" means after the trigger condition imposed by the third sentence occurs.[11] The second dependent word is "additional," which is defined as "a supplement." Id. Obviously, additional presupposes something coming before it, and the placement in this sentence of the word "additional" before the word "amounts" reflects the limited nature of Interstate's obligation to pay. The third limiting word is "only," which is defined as "[n]o more than." Id. In this sentence, "only" precedes "such additional amounts," further reflecting the limited nature of Interstate's obligation to pay.[12]
Based on the above definitions, we translate this sentence as providing that after the triggering event, defined in the third sentence, the next event is the activation of Interstate's obligation to pay, and that obligation will be for no more than such supplemental amounts necessary to provide the total combined coverage. This sentence thus clarifies that the excess insurer's (Interstate's) limits are in addition to the primary insurer's (Champion's) limits.
This sentence also sets forth a formula for calculating the supplemental amount that Interstate is obligated to pay after its coverage is activated. Under this formula, the amount Interstate must pay is determined by totalling the sum of the underlying primary limits and the excess limits, and subtracting from that sum the full amount of the primary limits, which the third sentence mandates that the primary insurer have either paid or been held liable to pay. Stated differently, the formula defines Interstate's obligation to pay as the remainder resulting after subtracting the full amount of the underlying primary limits from the "total coverage."[13] It necessarily follows that Interstate's liability is limited to the amount over and above the underlying primary insurance, regardless of its collectibility. We thus discern no indication from this sentence that the parties intended Interstate's coverage to "drop down" in the event of Champion's insolvency.
While we construe Interstate's policy as plainly precluding drop down coverage, we nonetheless address each of the three factors LIGA contends supports the appellate court's contrary construction; namely: (i) the reasonable *767 expectations doctrine, (ii) the rule of strict construction and (iii) public policy considerations.

(i) The Reasonable Expectations Doctrine:
Relying on the reasonable expectations doctrine, the appellate court concluded that the insureds were entitled to reasonably expect that Interstate would fill in any gap in coverage created by Champion's insolvency; specifically, the appellate court stated:
We agree with LIGA that a reasonable policyholder could read the language in question as an agreement to pay the sums necessary to cover the policyholder under both policies. The policyholder, who has in good faith paid the required premiums, should get the benefit of reasonably expected coverage.
Interstate Fire, 613 So.2d at 213. Disagreeing, the dissenting judge stated:
No insured could reasonably expect or intend to receive more than the contractually agreed upon amount of coverage when purchasing an excess insurance policy, and no insurer could reasonably expect to provide more. Under the majority's interpretation, an insured who contracts for $100,000.00 excess coverage over a $100,000.00 primary policy would receive $200,000.00 coverage from the excess insurer if the primary insurer was unable to pay. This could not possibly be the common intent of the parties.
Id., 613 So.2d at 214.
Consistent with the dissenting judge's statement, the majority of courts nationwide addressing this issue have held that insureds cannot reasonably expect that if their primary insurer is declared insolvent, their excess insurer will drop down and cover losses from dollar one.[14] The underlying basis for these holdings is the very nature and purpose of excess insurance.
Theoretically, an insured purchases excess insurance for the purpose of providing supplemental coverage that picks up where his primary coverage ends and thus providing protection against catastrophic losses. Lindsey v. Poole, 579 So.2d 1145, 1147 (La.App. 2d Cir.), writ denied, 588 So.2d 100 (La. 1991); Coates v. Northlake Oil Co., 499 So.2d 252, 255 (La.App. 1st Cir.1986), writ denied, 503 So.2d 476 (La.1987) (collecting authorities). It follows then that the purpose of excess insurance is to protect the insured against excess liability claims, not to insure against underlying insurer insolvency. Playtex FP, Inc. v. Columbia Cas. Co., 622 A.2d 1074, 1078 (Del.Super.1992).
The very nature of excess insurance coverage is such that a predetermined amount of underlying primary coverage must be paid before the excess coverage is activated.[15] The existence of the underlying primary coverage both reduces the risk assumed by the excess carrier and translates into a reduced premium to the insured.[16] The reduced premium *768 reflects the parties' intent that excess coverage attaches only after a predetermined amount of primary coverage has been exhausted. Benton v. Long Mfg. N.C., Inc., 550 So.2d 859, 861 n. 2 (La.App. 2d Cir.1989) (collecting cases).
Recognizing the reality that the primary insurer's insolvency is not a bargained-for risk, one court remarked that "[i]t would simply make no sense to hold that an `excess' insurer should be liable as a primary insurer. This would impose a liability on the `excess' insurer which is not bargained for in its premium that is based on the lesser risk which an excess carrier agrees to assume." Radiator Specialty Co. v. First State Ins. Co., 651 F.Supp. 439, 442 (W.D.N.C.), aff'd, 836 F.2d 193 (4th Cir.1987). Oftcited is the comment that imposing such unbargained-for risk on the excess insurer "would, in effect, transmogrify the policy into one guaranteeing the solvency of whatever primary insurer the insured might chose." Continental Marble & Granite v. Canal Ins. Co., 785 F.2d 1258, 1259 (5th Cir.1986); Lindsey, 579 So.2d at 1149-50 (noting that "impos[ing] a duty upon an excess insurer to guarantee the solvency of a primary carrier, would transform an excess policy into a suretyship agreement").
Summarizing, the courts that have looked beyond the policy language to other external factors, such as the premiums paid and the purpose and nature of excess insurance, have concluded that an insured lacks a reasonable expectation that in the event of his primary insurer's insolvency his excess insurer will provide drop down coverage. Accordingly, although the reasonable expectations doctrine has reared its head in a handful of drop down cases, it is inappropriate in this context. P. Magarick, Excess Liability § 17.12[5] (3d Ed.1993).

(ii) The Rule of Strict Construction:
Virtually all of the decisions construing excess policies as providing drop down coverage, including the appellate court's decision in the instant case, have centered on the rule of strict construction. "The familiar canon of insurance contract interpretationthat ambiguities are to be construed in favor of the insuredpervades both the analysis and conclusions of the courts." P. Brady and J. Grogan, The Excess Drop Down Issue: When Is The Excess Carrier Responsible for The Insolvency of a Primary Carrier?, FICC Quarterly, Fall 1988 at 63.[17] The common thread running through the jurisprudence on the drop down coverage issue is that the determinate factor is the particular policy language. Until recently, however, the problem created by an insolvent primary insurer was rarely addressed in the policy.[18] As a result, in keeping with the settled rule of strict construction, the argument has been advanced that an excess insurer's failure to exclude in its policy the risk of primary insurer insolvency drop down creates an ambiguity which, in turn, could serve as a basis for finding drop down coverage. See, e.g., McGuire v. Davis Truck Services, Inc., 518 So.2d 1171 (La.App. 5th Cir.), writ denied, 526 So.2d 791 (La.1988); Gulezian v. Lincoln *769 Ins. Co., 399 Mass. 606, 506 N.E.2d 123, 126 (1987).
Accepting that argument, the Gulezian court held that "[t]he phenomenon of the insolvency of an insurer is not, however, so rare as to excuse that omission of attention to detail. The result is that [the excess insurer] issued a policy in which it generated uncertainty as to what should happen on the insolvency of a primary insurer." 506 N.E.2d at 126. That view, however, has not prevailed; rather, the prevailing view is that the absence of an express insolvency drop down exclusion creates neither policy ambiguity nor drop down coverage. Playtex, 622 A.2d at 1078; Highlands, 702 F.Supp at 113. Silence should not be confused with ambiguity since "[i]t is just as logical to conclude that by not specifically listing insolvency as an exclusion, the parties did not contemplate insolvency of the insurer as an event triggering liability." Fred Weber, Inc. v. Granite State Ins. Co., 829 S.W.2d 589, 593 (Mo.App. 1992).
Span, Inc. v. Associated Int'l Ins. Co., 227 Cal.App.3d 463, 277 Cal.Rptr. 828, 835 (1991), is a good example of the proper application of the rule of strict construction in this context. The Span court points out that a majority of courts that have construed excess policy language requiring exhaustion by payment of losses, or language similar thereto, have found that such language precludes drop down coverage. Explaining away policy silence on the subject of drop down coverage, the Span court reasons that when an excess policy provides that only payment of the primary limits activates the excess coverage, "insolvency of the primary carrier is excluded, indirectly, but unambiguously." 277 Cal. Rptr. at 835.
Accordingly, the rule of strict construction does not require that the excess policy make specific provision for the primary carrier's insolvency. Highlands, 702 F.Supp at 112. Nor does the fact that the policy provides only excess coverage have to "be repeated in every policy provision, and unless there is language present in the policy which affirmatively contradicts what was the parties' plain intent, close linguistic analysis is nothing more than sophistry." Id.
In the same vein, we have cautioned that the rule of strict construction "does not authorize a perversion of language, or the exercise of inventive powers for the purpose of creating an ambiguity where none exists, nor does it authorize the court to make a new contract for the parties or disregard the evidence as expressed, or to refine away the terms of a contract expressed with sufficient clearness to convey the plain meaning of the parties, and embodying requirements, compliance with which is made the condition to liability thereon." Massachusetts Mutual Life Ins. Co. v. Nails, 549 So.2d 826, 832 (La.1989)(quoting Muse v. Metropolitan Life Ins. Co., 193 La. 605, 607, 192 So. 72, 74 (1939)). As we noted long ago:
"[W]hile it is highly important that ambiguous clauses should not be permitted to serve as traps for the policy holders, it is equally important, to the insured as well as the insurer, that the provisions of insurance policies which are clearly and definitely set forth in appropriate language, and upon which the calculations of the company are based, should be maintained unimpaired by loose and ill-considered interpretations."
Hemel v. State Farm Mutual Automobile Ins. Co., 211 La. 95, 29 So.2d 483, 486 (1947) (quoting Williams v. Union Central Life Ins. Co., 291 U.S. 170, 54 S.Ct. 348, 78 L.Ed. 711 (1934)); Watts v. Aetna Casualty and Surety Co., 574 So.2d 364, 369 (La.App. 1st Cir.), writ denied, 568 So.2d 1089 (La.1990) ("courts should not strain to find an ambiguity where none exists"). In short, Louisiana jurisprudence cautions against the alteration of unambiguous policy terms under the guise of interpretation. See Civil Law Treatise, supra § 4 (collecting cases).
Echoing these policy concerns, courts nationwide have recognized that, as a general rule, policies which clearly state that they are excess are not required to provided drop down coverage. P. Magarick, Excess Liability § 17.12 (3d Ed.1993) (collecting cases); see, e.g., Highlands Ins. Co. v. Gerber Products Co., 702 F.Supp. 109, 112 (D.Md.1988). Consequently, courts have refused to extend an excess carrier's coverage when the coverage provided by the policy clearly was intended *770 to be limited. Molina v. United States Fire Ins. Co., 574 F.2d 1176, 1178 (4th Cir.1978); Radar v. Duke Transp., Inc., 492 So.2d 532, 536 (La.App. 3d Cir.1986). "Where there is a clear delineation between primary and excess coverage, the risk of the primary insurer's insolvency is placed on the assured. The limits of the primary policy are borne by the assured or the state guarantee fund. The excess carrier's liability is limited solely to the risk against which it insured." M. Sledge and G. Baca, Rights and Duties of Primary and Excess Insurance Carriers, 15 Tul.Mar.L.J. 59, 63-64 (1990); See Kelly, supra; Garmany v. Mission Ins. Co., 785 F.2d 941, 946-47 (11th Cir.1986) (noting that absent ambiguity in policy, "literal dictates of the policy language" are controlling).
An exception to the general rule exists only when the policy uses language that creates a "genuine ambiguity" as to the scope of coverage. Highlands, 702 F.Supp at 112. Language that has been construed to create such a genuine ambiguity includes "[c]lauses indicating that an excess insurer will provide coverage over underlying `collectible' or `recoverable' insurance." Id.; Kelly, 563 So.2d at 222.
To determine whether an excess policy could reasonably be construed to provide drop down coverage, courts have looked to the policy's triggering language, which defines the scope of coverage and which is generally set forth in the limits of liability provision. Interco Inc. v. National Surety Corp., 900 F.2d 1264, 1267 n. 4 (8th Cir.1990) (collecting cases); Highlands, 702 F.Supp. at 112-113. While such language is lacking from the Interstate limits of liability provision, the appellate court, as noted above, found the fourth sentence of that provision susceptible to at least two reasonable interpretations, creating a policy ambiguity which, in turn, served as the basis for applying the rule of strict construction to find drop down coverage. Contrary to the appellate court's conclusion, there are several significant qualifications on the rule of strict construction that prohibit its application here.
The first limitation is that, as expressly stated in LSA-C.C. Art. 2056, which codifies the rule of strict construction, it applies only "[i]n case of doubt that cannot be otherwise resolved." LSA-C.C. Art. 2056 (emphasis supplied). Another limitation is that it applies only when after applying the other general rules of construction, including interpreting the contract as a whole, a genuine ambiguity in meaning remains. Trinity Industries, Inc. v. Ins. Co. of North America, 916 F.2d 267, 269 n. 9 (5th Cir.1990) (noting that ambiguity "in the air" does not justify strict construction against an insurer); Dugger v. Upledger Inst., 795 F.Supp. 184, 188 (E.D.La.1992), aff'd, 8 F.3d 20 (5th Cir.1993). Lastly, it applies only if the ambiguous policy provision is susceptible to two or more reasonable interpretations; for a genuine ambiguity to exist, the insurance policy must be not only susceptible to two or more interpretations, but the alternative interpretations must be equally reasonable. Caraway v. Royale Airlines, Inc., 559 So.2d 954, 959 (La. App. 2d Cir.1990), rev'd in part on other grounds, 579 So.2d 424 (La.1991) (collecting cases); see also Radiator Specialty Co. v. First State Ins. Co., 651 F.Supp. 439, 442 (W.D.N.C.), aff'd, 836 F.2d 193 (4th Cir.1987) (stressing that the key word is "reasonable").
Applying those limitations to the present case, we find that the appellate court allowed the rule of strict construction to overshadow the other principles of contract construction, including that the policy be construed in accordance with its plain and ordinary meaning. A more basic flaw in the appellate court's construction is that, as Interstate contends, it ignores LSA-C.C. Art. 2050's mandate that the contract be construed as a whole. As demonstrated above, considered in its entirety, Interstate's policy, by its plain terms, provides coverage only in excess of Champion's underlying limits, regardless of the collectibility of such limits. See Radiator, 651 F.Supp. at 442 (rejecting argument that a single phrase in the policy be read in isolation so as to create an ambiguity, reasoning that "[t]o so hold would completely ignore all of the definitions and Terms and Conditions of the Policy, which clearly rule out [the] argument that this policy is subject to two interpretations"); see also Fried v. North River Ins. Co., 710 F.2d 1022, 1025 *771 (4th Cir.1988) ("[t]hese rules of liberality and favorable treatment do not give courts carte blanche to fashion coverage in every case for the putative insured").
A further flaw in the appellate court's construction is that it is not a reasonable one. Indeed, the dissenting judge posited the following hypothetical to illustrate the unreasonableness of the majority's construction and the anomaly it creates:
Suppose plaintiff had a $10,000.00 Champion primary policy and a $10,000.00 Interstate excess policy. If the plaintiff's total judgment was $9,999.99, Interstate would owe nothing; LIGA would pay the judgment. But if the plaintiff's total judgment was $10,000.00, LIGA would pay nothing and Interstate would pay the full $10,000.00. And if the plaintiff's judgment were $20,000.00, Interstate would be cast for the entire amount.
Id. at 214. As demonstrated above, Interstate's excess policy is susceptible to only one reasonable interpretation under which drop down coverage is precluded. Hence, we conclude that Interstate's policy language cannot reasonably be interpreted to mean that it was contracting to insure Champion's solvency; therefore, the rule of strict construction is inapposite.

(iii) Public Policy Considerations:
LIGA further contends that public policy dictates that Interstate be held liable to provide drop down coverage from dollar one, precluding the triggering of LIGA's statutory responsibility. In essence, LIGA urges that the stability of the guaranty fund requires that other solvent insurers be required to pay first and that the fund be looked to solely as a last resort. LIGA further urges that the fund is designed to protect policyholders, not to protect other insurance companies from each others insolvencies. We find LIGA's public policy argument unavailing.
The statutory provisions creating the guaranty fund cannot upset contractually provided for ranking of coverages between insurers. See Maricopa County v. Federal Ins. Co., 757 P.2d 112 (1988); Ambassador Associates v. Corcoran, 143 Misc.2d 706, 541 N.Y.S.2d 715, 718 (N.Y.Sup.1989) (finding that "the legislature intended the Fund, not any excess insurers, to pay such [drop down] claims"). Moreover, the nature and purpose of excess insurance, outlined in detail above, favor a finding for the excess insurer; as one commentator explains:
Several courts have declined to hold in favor of the insured on the grounds that such a holding would, in effect, mean that the excess carrier insures the solvency of the underlying carrier. Others have considered the fact that an excess insurer assumes a smaller risk than does an underlying carrier, a fact which is reflected in the cost of the insurance policy. Requiring an excess carrier to "drop down" places an unfair burden on the excess carrier, which "must be able to ascertain the point at which its liability will attach in order to gauge the insurable risk and its cost of coverage."
J. Schaller, M. Medaglia, R. Kelly and A. LeBel, Excess, Surplus Lines and Reinsurance: Recent Developments in Umbrella and Excess Liability Insurance, 24 Tort and Ins. L.J. 283, 295 (1989); see, e.g., Hudson Ins. Co. v. Gelman Sciences, Inc., 921 F.2d 92 (7th Cir.1990); Hendrix v. Fireman's Fund Ins. Co., 823 S.W.2d 937 (Ky.App.1991); Fried v. North River Ins. Co., 710 F.2d 1022, 1025-26 (4th Cir.1983) ("equitable considerations will not be employed to rewrite the terms of [the] policy"). "To ignore the language of such a contract, and in effect impose a duty upon an excess insurer to guarantee the solvency of a primary carrier, would transform an excess policy into a suretyship agreement." Lindsey v. Poole, 579 So.2d 1145, 1149-50 (La.App. 2d Cir.), writ denied, 588 So.2d 100 (La.1991). Consequently, we decline LIGA's invitation to rewrite Interstate's policy.[19]

V.
Our findings that Interstate has no obligation under the reasonable expectations doctrine or as a result of applying the rule of *772 strict construction or as a matter of public policy to provide drop down coverage are strengthened by the jurisprudence holding that absent a specific requirement or undertaking in the excess policy to step down in the event of the primary insurer's insolvency, an excess insurer's coverage should not be construed as stepping down. See W. Freedman, 2 Richards on the Law of Insurance § 13:5 (6th Ed.1990) (discussing American Re-Insurance Co. v. SGB Universal Builders Supply, Inc., 141 Misc.2d 375, 532 N.Y.S.2d 712 (Sup.1988)); see also Federal Ins. Co. v. Srivastava, 2 F.3d 98, 102 (5th Cir.1993) ("the insolvency of an underlying carrier, by itself, has no effect on where the layer of excess coverage begins").[20]
New Process Baking Co. v. Federal Ins. Co., 923 F.2d 62 (7th Cir.1991), is illustrative. There, the court declined to impose the risk of the primary insurer's (Mission's) insolvency on the excess insurer (Federal), reasoning that "[i]n the absence of clear language imposing on Federal the risk of Mission's insolvency, we decline to create any `drop down' obligation for Federal." Id. at 63.
While this jurisprudential rule is not controlling, it provides a powerful guideline supporting our construction of the Interstate policy language in question as precluding drop down coverage. Absent something in the policy indicating that Interstate clearly assumed the obligation to pay more in some instances, Interstate, as excess insurer, should not have to do so. Here, there is nothing in Interstate's policy saying that it as excess carrier has to pay more.
Our construction of the Interstate policy as precluding drop down is further strengthened by the modern trend against imposing a drop down obligation on an excess carrier. Explaining the trend, one commentator aptly noted that "[v]arious courts use different reasons for denying drop down; some reasoning on public policy grounds, some based on policy language which the court deems indicates an intent not to drop down, some based on limits of underlying coverage, and still others on reasoning only understood by the court itself." H. Berg, Fundamentals of Insurance Insolvency Laws, 38 Prac.Law.-No. 7, October 1992 at 59. As the above discussion demonstrates, our decision is based on several, if not all, of those factors.
Though the dispositive language of Interstate's policy is not the plainest, we find it sufficiently plain and unambiguous to yield an interpretation as a matter of law on cross motions for summary judgment.[21] Considering the Interstate policy as a whole, and in particular the fourth sentence of the limits of liability provision, we conclude that there is no ambiguity as to whether Interstate would provide primary coverage in the event of Champion's insolvency. Accordingly, we hold that Interstate is obligated to provide coverage only for a loss in excess of the $10,000/$20,000 limits of Champion's primary policy.

*773 VI.
For the reasons set forth above, the judgment of the district court granting LIGA's motion for summary judgment is reversed, and Interstate's cross-motion for summary judgment is granted to the extent of declaring that the terms of Interstate's excess policy are unambiguous and do not require Interstate to "drop down." Interstate is obligated to pay only that portion of a loss over and above the $10,000/$20,000 limits of Champion's primary policy.
REVERSED.
NOTES
[*] Pursuant to Rule IV, Part 2, § 3, Lemmon, J., was not on the panel which heard and decided this case. See footnote in State v. Barras, 615 So.2d 285 (La.1993).
[1] By "drop down" is meant "the minimum threshold of the excess insurance company's obligation is lowered in order to cover the gap in coverage resultant from the primary insurance company's insolvency." 1 Business Insurance Law and Practice Guide § 4.100[1](1991). Drop down coverage "occurs when an insurance carrier of a higher level of coverage is obligated to provide the coverage that the carrier of the immediately underlying level of coverage has agreed to provide." Fred Weber, Inc. v. Granite State Ins. Co., 829 S.W.2d 589, 590 n. 2 (Mo.App. 1992). An excellent survey of cases addressing the drop down coverage issue is found in Annotation, Primary Insurer's Insolvency As Affecting Excess Insurer's Liability, 85 A.L.R.4th 729 (1991).
[2] There is no completed declarations page in the record in this case; rather, the record contains a sample policy and a sample declarations page. This is because these declaratory actions do not involve specific claims by insureds. Instead, these declaratory judgment actions are stipulated to be binding on roughly two hundred such policies. The initial petitions filed in these actions recite roughly thirty such policies on which actual losses have been claimed.
[3] Loss payable clauses typically provide that an excess insurer's liability will not attach until the underlying insurer or the insured has paid or been held liable to pay the underlying limits. P. Brady and J. Grogan, The Excess Drop Down Issue: When Is The Excess Carrier Responsible For The Insolvency of a Primary Carrier?, FICC Quarterly, Fall 1988 at 73; J. Schaller, M. Medaglia, R. Kelley and A. LeBel, Excess, Surplus Lines and Reinsurance: Recent Developments in Umbrella and Excess Liability Insurance, 24 Tort & Ins.L.J. 283, 294 (1989). A loss payable clause "`speaks only to the insurer's liability to pay excess. It says nothing about the excess coverage lower limit dropping down.'" Massachusetts Bay Transp. Auth. v. Allianz Ins. Co., 413 Mass. 473, 597 N.E.2d 439, 443 (1992) (quoting Vickodil v. Lexington Ins. Co., 412 Mass. 132, 587 N.E.2d 777,780 (1992), which declined to follow Northmeadow Tennis Club, Inc. v. Northeastern Fire Ins. Co. of Pennsylvania, 26 Mass.App.Ct. 329, 526 N.E.2d 1333, review denied, 403 Mass. 1103, 529 N.E.2d 1345 (1988)); Denny's, Inc. v. Chicago Ins. Co., 234 Cal.App.3d 1786, 286 Cal. Rptr. 507, 512 (2 Dist.1991).
[4] The third Kelly category is not relevant here. We note that one court already has identified a fourth Kelly category, comprised of policies containing an anti-drop down provision. McWright v. Modern Iron Works, Inc., 567 So.2d 707 (La. App.2d Cir.), writ denied, 571 So.2d 651 (La. 1990) (citing Robichaux v. Randolph, 563 So.2d 226 (La.1990)); see also Linares v. Louisiana Dept. of Transp. and Dev., 582 So.2d 879, 883 (La.App. 4th Cir.1991).
[5] Given the uniqueness of the policy language under scrutiny, we reiterate our warning in Central Louisiana Electric Co., Inc. v. Westinghouse Elec. Corp., 579 So.2d 981, 985 (La.1991), that in interpreting an insurance policy based on prior jurisprudence, the court must carefully compare the language in the policy under scrutiny with that of the policies construed in the prior cases because a difference in verbiage may dictate a difference in outcome.
[6] While the policy in Northmeadow Tennis, supra, contained an almost identical provision to the Interstate limit of liability provision, the Northmeadow Tennis holding that the excess insurer was required to drop down was based solely on the loss payable clause and was repudiated by subsequent cases. See Note 3, supra, discussing loss payable clauses.
[7] LSA-C.C. Art. 2047 provides that "[t]he words of a contract must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter."
[8] LSA-C.C. Art. 2050 provides that "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole."
[9] The reasonable expectations doctrine can be capsulized as follows: "courts will protect the [insured's] reasonable expectations ... regarding the coverage afforded by insurance contracts even though a careful examination of the policy provisions indicates that such expectations are contrary to the expressed intention of the insurer." R. Keeton and A. Widiss, Insurance Law § 6.13 (1988).
[10] The appellate court's decision sets forth in full these policy provisions. Interstate Fire, 613 So.2d at 212.
[11] The appellate court, as noted above, found that "the agreement to pay whatever is needed to afford this coverage is triggered only when the conditions of the third sentence are met," and modified the district court judgment to reflect those conditions. Interstate Fire, 613 So.2d at 213-14.
[12] The construction urged by LIGA that this sentence constitutes an unconditional guarantee of payment of the combined coverage effectively reads these three limiting words out of the sentence and is inconsistent with the nature and purpose of an excess insurance policy. We thus reject it.
[13] We note that "coverage" is universally defined as the amount and extent of risk contractually assumed by the insurer. Black's Law Dictionary 330 (5th Ed.1979); Guaranty National Ins. Co. v. Bay side Resort, Inc., 635 F.Supp. 1456, 1458 (D.Virgin Is. 1986) (collecting cases). This sentence thus does not condition Interstate's obligation to pay on the collectibility of the primary coverage.
[14] Vickodil v. Lexington Ins. Co., 412 Mass. 132, 587 N.E.2d 777, 779 (1992); Alaska Rural Electric Coop. Ass'n, Inc. v. INSCO Ltd., 785 P.2d 1193 (Alaska 1990); Maricopa County v. Federal Ins. Co., 157 Ariz. 308, 757 P.2d 112, 114 (App. 1988); Seaway Port Authority of Duluth v. Midland Ins. Co., 430 N.W.2d 242, 249-50 (Minn. App.1988); Rapid City Regional Hosp., Inc. v. South Dakota Ins. Guar. Ass'n, 436 N.W.2d 565, 567 (S.D.1989); Hendrix v. Fireman's Fund Ins. Co., 823 S.W.2d 937, 941 (Ky.App.1991); American Hoist & Derrick Co. v. Employers' of Wausau, 454 N.W.2d 462, 467 (Minn.App.1990); Radiator Specialty Co. v. First State Ins. Co., 651 F.Supp. 439, 442 (W.D.N.C.), aff'd, 836 F.2d 193 (4th Cir.1987); see contra McGuire v. Davis Truck Services, Inc., 518 So.2d 1171 (La.App. 5th Cir.), writ denied, 526 So.2d 791 (La.1988); Massachusetts Insurers Insolvency Fund v. Continental Cas. Co., 399 Mass. 598, 506 N.E.2d 118 (Mass.1987).
[15] Federal Ins. Co. v. Srivastava, 2 F.3d 98, 102 (5th Cir.1993)("[a]n excess policy's coverage usually begins when all of the underlying insurers have exhausted their policies by paying to their policy limits"); see 16 G. Couch, R. Anderson and M. Rhodes, Couch on Insurance § 62.48 (2d Ed.1983) (defining excess insurance as coverage attaching only after a predetermined amount of underlying coverage is exhausted); 8A J. Appleman and J. Appleman, Insurance Law and Practice § 4909.85, p. 452 (1981) (excess policies "are policies of insurance sold at comparatively modest cost to pick up where primary coverages end, in order to provide extended protection").
[16] Maricopa County v. Federal Ins. Co., 157 Ariz. 308, 757 P.2d 112, 114 (App.1988) ("an insured pays a reduced premium to the excess carrier expressly because that carrier will be obligated to pay a claim only after a certain amount has been paid by the primary insurer"); see also Steve D. Thompson Trucking, Inc. v. Twin City Fire Ins. Co., 832 F.2d 309, 310 (5th Cir.1987); Harville v. Twin City Fire Ins. Co., 885 F.2d 276, 278 (5th Cir.1989) ("[e]xcessliability insurers contract to provide inexpensive insurance with high policy limits by requiring the insured to contract for primary insurance with another carrier").
[17] See H. Berg, Fundamentals of Insurance Insolvency Laws, 38 Prac.Law.No. 7, October 1992 at 59 (noting that "[t]he courts that have construed excess policies to drop down have generally done so on the basis that the policy language was ambiguous and therefore the doctrine of contra proferentum applied in favor of the policyholder"); 1 Business Insurance Law and Practice Guide § 4.09[1] (1991); see, e.g., Ambassador Associates v. Corcoran, 143 Misc.2d 706, 541 N.Y.S.2d 715, 717 (N.Y.Sup.1989) (noting that "[i]n the absence of an ambiguity in the policy, no drop down is warranted").
[18] The current policies now often expressly include anti-drop down provisions. See H. Berg, Fundamentals of Insurance Insolvency Laws, 38 Prac.Law.No. 7, October 1992 at 59-60 (noting that "[a]s most of the newer policies now contain express provisions declaring that their excess coverage will not be triggered because of the primary insurers' or lower level insurers' insolvency, the issue may become moot.") Examples of recent Louisiana cases enforcing such antidrop down policy provisions include Robichaux v. Randolph, 563 So.2d 226 (La.1990) (collecting cases), and Linares v. Louisiana Dept. of Transp. and Dev., 582 So.2d 879, 883 (La.App. 4th Cir. 1991).
[19] See Note 12, supra, discussing and rejecting LIGA's contention that the fourth sentence constitutes an unconditional guarantee of payment of the combined coverage limits.
[20] See Alaska Rural Electric Coop. Ass'n, Inc., v. INSCO Ltd., 785 P.2d 1193 (Alaska 1990) ("absent policy language to the contrary, an excess insurer is not required to drop down and provide primary coverage when the primary insurer becomes insolvent"); Playtex FP, Inc. v. Columbia Cas. Co., 622 A.2d 1074, 1078 (Del.Super.1992) ("[a]bsent policy language indicating that the parties intended to provide for insolvency drop down, the court would be adding coverage which was not provided by the contract if it were to require insolvency drop down"); American Hoist & Derrick Co. v. Employers' of Wausau, 454 N.W.2d 462, 467 (Minn.App.1990) (noting that numerous jurisdictions have declined to require excess insurers to drop down absent an "express agreement" to do so); Rapid City Regional Hosp., Inc. v. South Dakota Ins. Guar. Ass'n, 436 N.W.2d 565 (S.D.1989) (declining to "judicially impose `drop down' liability on excess insurers... who do not contract for such liability"); Seaway Port Auth. of Duluth v. Midland Ins. Co., 430 N.W.2d 242, 249-50 (Minn.App.1988) (refusing to require an excess carrier to provide drop down coverage absent an express agreement to do so).
[21] In this regard, we note that the procedural problem presented in Kelly regarding rendering a partial summary judgment on the insurance coverage issue has been cured by a legislative amendment to LSA-C.C.P. Art. 966(D). Kelly, 563 So.2d at 226 n. 8 (discussing this procedural problem). LSA-C.C.P. Art. 966(D) now provides that "[a] summary judgment may be rendered on the issue of insurance coverage alone although there is a genuine issue as to liability or the amount of damages."