IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-30720
_____


THE ST. PAUL INSURANCE COMPANY,

                                        Plaintiff-Appellee,
                                        Cross-Appellant,

                        versus

THE YORKSHIRE INSURANCE COMPANY, LIMITED;
COMMERCIAL UNION ASSURANCE PUBLIC LIMITED
COMPANY, TOKIO MARINE & FIRE INSURANCE
COMPANY (UK) LIMITED; THE OCEAN MARINE
INSURANCE COMPANY LIMITED; INDEMNITY MARINE
ASSURANCE COMPANY LIMITED; NORTHERN
ASSURANCE COMPANY LIMITED; AXA MARINE AND
AVIATION INSURANCE (UK) LIMITED; ZURICH RE (UK)
LIMITED; TERRA NOVA INSURANCE COMPANY;
PHOENIX ASSURANCE PUBLIC LIMITED COMPANY,

                                        Defendants-Appellants,
                                        Cross-Appellees.

_____

Appeal from the United States District Court for
the Middle District of Louisiana
(USDC No. 97-CV-1087-C )
_____
May 8, 2001


Before KING, Chief Judge, REAVLEY and JONES, Circuit Judges.

REAVLEY, Circuit Judge:[*]

This is a suit between a group of primary insurers (collectively, the primary underwriters) and an excess-liability insurer. At issue is whether legal defense fees and expenses incurred by the primary underwriters count toward their policy limit. If they do not, then the primary underwriters owe defense costs to St. Paul Insurance Co. (St. Paul), the excess-liability insurer. The district court construed the contract against the primary underwriters. There is also an issue of pre-judgment interest that St. Paul cross-appeals. We affirm.

*Background*

On August 15, 1994, there was an explosion at the Mississippi River facility operated by HBM River Plant, Inc. The explosion occurred while HBM personnel were pumping toluene, a flammable liquid, from a tank barge. This explosion engendered several lawsuits against HMB River Plant, Inc. and its corporate parent, Hall-Buck Marine, Inc. (collectively, Hall-Buck).

Four lawsuits brought by employees of Hall-Buck who were injured in the explosion were settled for a total of $2,175,000. The primary underwriters and St. Paul were the primary and excess-liability insurers, respectively, of Hall-Buck. St. Paul insured Hall-Buck against any liability that was not covered by the primary underwriters.

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Before the suits were settled, the primary underwriters spent $558,000 in legal fees and expenses defending Hall-Buck. Because the primary underwriters believed that under their contract with Hall-Buck, these costs counted towards their policy limit of $1,000,000, they contributed $442,000 towards the settlement. St. Paul contributed the balance of $1,617,000.

St. Paul then filed this action in a Louisiana state court seeking a declaration that the primary underwriters' fees and expenses did not count towards their policy limit. St. Paul also sought a declaration that it was owed pre-judgment interest. The primary underwriters removed. The case was tried on stipulated facts, documentary evidence, and briefs. The district court decided that the primary underwriters' contract with Hall-Buck was ambiguous as to whether legal fees and expenses counted towards the policy limit and concluded that, because the primary underwriters drafted the contract, it should be construed against them. The district court found that no pre-judgment interest was owed. The primary underwriters appeal, and St. Paul cross-appeals on the matter of pre-judgment interest.

*The Policy*

Under Louisiana law, we apply the general rules of contract interpretation to an insurance policy.[1] The policy provides a variety of coverages, including shiprepairers

---

[1] *See Reynolds v. Select Properties, Ltd.* 634 So. 2d 1180, 1183 (La. 1994).

3

liability and commercial general liability.  Several different provisions in the contract address the question of whether legal fees and expenses count towards the policy limit. The general conditions section, for instance, contains a provision extending coverage to "Defence costs within limits as per Cost Clause attached."  The Cost Clause provides that the primary underwriters will pay "all costs, charges and expenses . . . in connection with any claims they require to be contested by the Assured (including Legal Representation   . . . in connection with the accident or occurrence from which such claim arises)."  The next paragraph provides that these costs are included in the total liability limit.

Thus, under the general conditions of the contract, defense costs count toward the policy limit.  If this were the end of the of the analysis, the primary underwriters would prevail.  The language of the general conditions section, however, is contradicted by the language that describes the commercial general liability coverage.  This provision states that the primary underwriters will pay "supplementary payments."  Supplementary payments are later defined to include "all expenses" with respect "to any claim or 'suit' we defend."  Furthermore, a provision states that "these payments will not reduce the limits of insurance."

This seems to be a clear statement that defense costs paid pursuant to commercial general liability coverage do not count towards the policy limit.  Although presumably the general conditions of the contract were meant to apply to the commercial general liability coverage, it is impossible to harmonize these two sections; they are contradictory on their

4

faces. And because the primary underwriters drafted the policy, we must construe this contradiction against them.[2]

Thus, if the settlements were paid out under the catch-all commercial general liability coverage, we must conclude that the defense costs did not count toward the limit. The primary underwriters therefore argue that the settlements were paid pursuant to the shiprepairers liability coverage, which, unlike the commercial general liability coverage, does not contain an exception to the policy's general condition that defense costs count towards the limit. The language detailing the shiprepairer's coverage provides that the limit includes "liability for costs and expenses . . . incurred with the written consent of the Underwriters hereon." Although by itself this language does not unambiguously state that legal fees and expenses count towards the limit,[3] when read in conjunction with the Cost Clause it must be understood to mean that.

The issue therefore turns on whether the settlements were paid under shiprepairers or commercial general liability coverage. The parties' stipulations are no help in this regard; they state that the settled claims were covered by "one or more coverage provisions." The primary underwriters argue that because the shiprepairers coverage is

---

[2] The primary underwriters argue that this rule of construction should not apply to them. For reasons we discuss later, we reject this contention.

[3] *Cf. Exxon Corp. v. St. Paul Fire & Marine Ins. Co.*, 129 F.3d 781, 787-88 (5th Cir. 1997).

more specific, it must have covered the settlements.[4]  Because we are unable to consider

unloading the contents of a ship as "repair,"[5] we conclude that the settlements were paid

under the broader commercial general liability coverage.  Furthermore, the primary

underwriters drafted the policy.  In Louisiana, ambiguous contracts are construed against

their drafters.[6]  The primary underwriters argue that this rule should not apply in a dispute

between two insurers.  They argue that the rule is intended to protect insureds, who are

generally the less sophisticated party, and therefore serves no purpose in a dispute

between insurers.  We disagree.  Although the rule does serve to protect insureds, it also

works to provide an incentive toward careful drafting.  Moreover, the rule, as encoded in

Louisiana statute, does not apply only to insurance contracts, but any time a form contract

is disputed.[7]  Indeed, the Louisiana Supreme Court has applied the rule in disputes

between insurers.[8]  Accordingly, we conclude that the primary underwriter's defense

costs did not count towards its policy limit.

---

[4]  *See Western Oil Fields, Inc. v. Penzoil United, Inc.*, 421 F.2d 387, 389 (5th Cir. 1970)

[5]  *See Reynolds*, 634 So. 2d at 1183 (holding that words in insurance policies are to be given their plain, ordinary meaning unless they have acquired a technical meaning).

[6]  *See* LA. CIV. CODE ANN. art. 2056.

[7]  *See id.*

[8]  *See Louisiana Ins. Guar. Assoc. v. Interstate Fire & Cas. Co.*, 630 So. 2d 759, 764 (La. 1994) (applying the rule in a dispute between an excess-liability insurer and the Insurance Guaranty Association, a private, nonprofit legal entity created by statute.)

*St. Paul's Cross-Appeal for Pre-judgment Interest*

In its brief to the trial court, St. Paul requested pre-judgment interest under Louisiana Revised Statutes section 13:4203, which provides for pre-judgment interest from the date of judicial demand in tort cases.[9]  St. Paul argued that the primary underwriters owed it interest on the full amount the primary underwriters owed the settlement fund, which St. Paul contended was $2,000,000.  The district court denied St. Paul's request, noting that neither the primary underwriters' contract nor Louisiana law required the primary underwriters to pay pre-judgment interest on settlements.

On appeal, St. Paul requests pre-judgment interest under article 2000 of the Louisiana Civil Code, which provides for pre-judgment interest in contract disputes when the object of performance is a sum of money.[10]  St. Paul now argues that it is owed pre-judgment interest on $558,000, the amount that the primary underwriters withheld from the settlement because of their defense costs.  Because St. Paul did not request this relief at trial we cannot grant it.

AFFIRMED.

---

[9]  *See* LA. REV. STAT. ANN. § 13:4203

[10]  *See* LA. CIV. CODE ANN. art. 2000.

7