CHAISSON, J.
In this insurance coverage dispute arising out of a multiple-impact automobile collision resulting in multiple injured victims, Lloyd's Syndicate 1861 ("Lloyd's") appeals a June 27, 2017 judgment of the trial court denying its motion for summary judgment and granting a cross-motion for summary judgment filed by Darwin National Assurance Company ("Darwin"). For the following reasons, we affirm the judgment of the trial court.
FACTS & PROCEDURAL HISTORY
On the morning of September 10, 2013, Mr. James Hyde, Jr., was driving his pickup truck approximately 70 miles per hour in the right lane of the elevated U.S. 90B West Bank Expressway. As he approached the Barataria Boulevard exit, Mr. Hyde rear-ended a pickup truck driven by Mrs. Shannon Riggio, striking the rear of her vehicle several times over a distance of approximately four-tenths of a mile. Mr. Todd Riggio was a passenger in that vehicle. The several impacts from Mr. Hyde's vehicle caused the Riggio vehicle to spin across several travel lanes and strike the center bridge rail. Mr. Hyde alleges that at the time of this initial impact he was knocked unconscious by the deployment of his airbag and does not remember anything else from that point on about the collision until being removed from his vehicle by emergency medical technicians.
Mr. Hyde's vehicle continued to travel forward at about 60 to 70 miles per hour in the right lane of the elevated expressway. Approximately two-tenths of a mile from his last impact with the Riggio vehicle, as he approached the entrance to the Barataria Boulevard right-exit down ramp, Mr. Hyde's vehicle struck the right side of a minivan driven by Ms. Carol Patai, before proceeding to the right, down the ramp towards Barataria Boulevard. Mr. Hyde's vehicle struck the down ramp retaining walls at least twice while traveling down the ramp. After exiting the ramp, Mr. Hyde's vehicle crossed four traffic lanes on the ground-level expressway service road and struck the rear corner of an SUV driven by Ms. Tresia Bonds that was stopped in the far right lane of the service road at the Avenue D traffic light.[1]
*713 Next, Mr. Hyde's vehicle, while still traveling approximately 60 miles per hour, crossed the northbound lanes of Avenue D and the median, struck a SUV driven by Ms. Kimberly Knoten in the left southbound lane of Avenue D, and finally came to a stop. Tyrone Vicks, Jr., an eight-year-old child who was a passenger in Ms. Knoten's vehicle, was seriously injured in this last collision.
According to the police reports, the total distance traveled by Mr. Hyde's vehicle from its initial impact with the Riggio vehicle to the final impact with the Knoten vehicle was approximately nine-tenths of a mile.[2] Attached to the third police report was a written statement of Ms. Angela Aubrey, a witness to all four impacts, who indicated that throughout the incident Mr. Hyde's vehicle was traveling at a high rate of speed. Ms. Aubrey did not indicate that Mr. Hyde's vehicle slowed or came to a stop at any time during this incident until after it struck Ms. Knoten's vehicle.
On the day of this incident, there were three separate insurance policies in effect that provided coverage to Mr. Hyde: a personal automobile insurance policy issued to Mr. Hyde by Geico Casualty Insurance Company ("Geico"); a marine general liability policy issued by Darwin to Mr. Hyde's employer, B & D Contracting, Inc.; and an excess policy issued by Lloyd's to B & D Contracting, Inc. The Riggios, Ms. Knoten, and Tyrone Vicks, Sr. (on behalf of his son, Tyrone, Jr.) filed suit against Mr. Hyde, his employer, B & D Contracting, Inc., and their insurers, in the 24th Judicial District Court. That lawsuit settled before trial for an amount well in excess of $1,000,000. At the time of that settlement, Darwin paid $1,000,000 to some of the plaintiffs, and Lloyd's, as the excess insurer, paid additional funds to the other plaintiffs for the relinquishment of those plaintiffs' claims.[3]
On March 15, 2017, Lloyd's filed a petition for damages against Darwin seeking to recover funds it paid in settlement of the Vicks lawsuit, contending that Darwin was responsible for the payment of those amounts under the terms of its insurance policy. Subsequent to Darwin answering the petition, both Lloyd's and Darwin filed cross-motions for summary judgment on the issue of the amount of coverage provided by the Darwin policy. The parties did not dispute that the Darwin policy provided a $1,000,000 per occurrence limit, and a $2,000,000 aggregate limit for any one policy period. The parties disagreed, however, as to whether this incident was one occurrence, as that term was defined in the Darwin policy, thus triggering the $1,000,000 per occurrence limit, or whether it was multiple occurrences, thus triggering the $2,000,000 aggregate limit.
In its motion for summary judgment, Lloyd's, in arguing that Mr. Hyde's incident was more than one occurrence and that Darwin was therefore responsible for its $2,000,000 aggregate limit, contended that "Louisiana case law holds that when accidents are separated by time and space, there are multiple accidents and multiple occurrences." To the contrary, Darwin, in its motion for summary judgment, in arguing that Mr. Hyde's incident was one occurrence *714 for which it was only responsible for its $1,000,000 per occurrence limit, contended that "a multi-impact accident is a single 'occurrence' when the collisions are an unbroken chain of events and the driver does not regain control of the vehicle."[4]
Following a hearing on the cross-motions for summary judgment, the trial court denied Lloyd's motion for summary judgment and granted Darwin's motion for summary judgment, thereby dismissing Lloyd's petition with prejudice, with each party to bear its own costs. In ruling from the bench, the trial court specifically found that although there were three collisions that day, there was one continuous series of events emanating from the original collision and that the collisions constituted one occurrence under the Darwin policy. It is from this judgment that Lloyd's takes its timely appeal.
In its sole assignment of error, Lloyd's argues that the trial court committed legal error in holding that a vehicle involved in three separate collisions had only one occurrence within the meaning of the Darwin insurance policy. Lloyd's argues that Mr. Hyde's collisions were separated by "significant" time and space, and therefore should be considered separate accidents under the policy language and in accordance with Louisiana case law. In opposition to Lloyd's position, Darwin argues that the language of the insurance policy that provides coverage for each "occurrence" covers multiple-impact car collisions in situations like this where the impacts are continuous and the at-fault driver never regains control.
DISCUSSION
Appellate courts apply a de novo standard of review in considering lower court rulings on summary judgment motions. Arceneaux v. Amstar Corp. , 15-0588 (La. 9/7/16), 200 So.3d 277, 281. Thus, we use the same criteria that govern the district court's consideration of whether summary judgment is appropriate. A motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(A)(3). Interpretation of an insurance policy is usually a legal question that can be properly resolved by means of a motion for summary judgment. Washington v. McCauley , 45,916 (La. App. 2 Cir. 2/16/11), 62 So.3d 173, 177.
An insurance policy is a contract between the parties and should be construed using the general rules of interpretation set forth in the Civil Code. Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co. , 93-0911 (La. 1/14/94), 630 So.2d 759, 763. The judicial responsibility in interpreting insurance contracts is to determine the parties' common intent. Id. The parties' intent, as reflected by the words in the policy, determines the extent of coverage. Id. Such intent is to be determined in accordance with the general, ordinary, plain and popular meaning of the words used in the policy, unless the words have acquired a technical meaning. La. C.C. art. 2047. An insurance policy should not be interpreted in an unreasonable or strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve *715 an absurd conclusion. Louisiana Ins. , 630 So.2d at 763.
The Darwin policy defines "occurrence" to mean "an accident, including continuous or repeated exposure in conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." In its appellate brief, Darwin maintains that, because Lloyd's brief fails to discuss the phrase "including continuous or repeated exposure in conditions" in its analysis of this case, Lloyd's asks this Court "to ignore the policy's definition of 'occurrence' and to ignore Louisiana jurisprudence by defining 'occurrence' to mean only 'an accident,' without more." Darwin suggests that because this phrase in the policy further qualifies the term "accident" beyond the ordinary or popular sense of that word when used on its own, thus narrowing the scope of coverage, this Court should employ an expanded definition of accident in this case. Regarding the applicability of the phrase, Darwin argues that "Hyde's continuous state of unconsciousness and lack of control of his vehicle-which undisputedly caused each of the successive impacts in this case-is a type of 'continuous or repeated exposure in conditions' included in Darwin's broad definition of 'occurrence.' " (emphasis added).
In response, Lloyd's, citing the Louisiana First Circuit case of Miley v. Continental Ins. Co. , 93-1652 (La. App. 1 Cir. 9/9/94), 645 So.2d 1166, maintains that the phrase "including continuous or repeated exposure in conditions," is only applicable to exposure cases, and has no applicability to multiple-impact automobile collisions.
In a discussion of the history of this particular phrase, Professor Robert H. Jerry, II, and Mr. Douglas R. Richmond, in their treatise "Understanding Insurance Law," state that "[i]n 1966, CGL policies were modified to cover 'occurrences,' and occurrence was defined as 'an accident, including continuous or repeated exposure to conditions.' This change made clear that the liability policy was intended to provide coverage not only for sudden, unexpected events but also for long-term exposures to harmful conditions or substances that resulted in damage during the policy period." See Understanding Insurance Law , 4th Ed., by Jerry and Richmond, LexisNexis, p. 535 (emphasis added).
In our review of Louisiana jurisprudence, although we find cases involving multiple-impact automobile collisions where the insurance policy at issue included the phrase "including continuous or repeated exposure to conditions" (or some variation thereof), we have found no case that relied upon that phrase as the basis to employ an expanded definition of the term "accident" in multiple-impact automobile cases. We agree with the First Circuit Court's conclusion in Miley that this phrase is not intended to apply to the traditional type of accident, specifically vehicular collisions, and that characterization of a multiple-impact automobile accident as "... an occurrence involving continuous or repeated exposure to substantially the same general harmful conditions [is] inappropriate." Miley , 645 So.2d at 1169. In our opinion, this phrase is intended to apply to traditional long-term exposure type cases, such as pile-driving or toxic fumes, etc. See , e.g. , Lombard v. Sewerage & Water Bd. , 284 So.2d 905 (La. 1973). It would require a strained reading of the phrase to find it applicable to multiple-impact automobile collisions. We therefore decline Darwin's invitation to view this multiple-impact automobile collision as a type of "continuous or repeated exposure in conditions," and we further decline its suggestion that we rely upon that phrase as a basis to employ an expanded definition of the term "accident."
*716 The Darwin policy contains no definition of the term "accident," and we must therefore give that term its common and generally prevailing meaning. Black's Law Dictionary defines accident as "an unforeseeable and unexpected turn of events that causes loss in value, injury, and increased liabilities. The event is not deliberately caused and is not inevitable." Black's Law Dictionary , "Accident" (10th ed. 2009). Merriam-Webster's Dictionary defines an accident as "an unforeseen and unplanned event or circumstance" or "an unfortunate event resulting especially from carelessness or ignorance." Accident , Merriam-Webster.com , Merriam-Webster , (n.d. Web, May 16, 2018).
Clearly, an accident does not simply happen in a vacuum; there must be some cause (or combination of causes) that triggers the accident. Once that cause has set some harm-producing violence in motion, the accident continues along an unbroken chain of events, only ending once the harm-producing violence stops and ceases to inflict additional injuries or damages.[5]
In the context of the typical automobile collision, both the beginning and the end of the accident are rather clear. An accident begins suddenly and unexpectedly, often involves an impact with a single object, and is usually of very short duration, ending just as suddenly as it began. In the more unusual type of automobile collision, like the one before us in this case, although beginning suddenly and unexpectedly, the incident has a somewhat longer duration and involves impacts with multiple objects that are often separated by some time and distance. In these latter type of collisions, it can sometimes prove challenging to discern whether there is only one accident or multiple accidents. In these cases the issue arises as to whether the insured driver's impact with each separate object is a separate accident, triggering multiple policy limits, or whether the entire incident comprising all of the impacts is a single accident, thus triggering only one policy limit.[6]
In Washington , supra , a case involving this same issue, the Louisiana Second Circuit reviewed cases from this state and from across the nation that involved this issue and found:
In determining whether a single policy limit or multiple policy limits should be applied to a particular situation, "occurrence" and "accident" have been defined by courts across the nation in three ways. The majority of courts have adopted the general view that, to determine whether there is a single or multiple occurrence or accident within the meaning of the policy limits clause of a liability policy, one must look to the cause or causes of the accident or occurrence. Other courts have looked to the effect of the accident or occurrence, making the entire policy limits available to each injured or damaged party. A *717 third group of courts has held that the phrase "per occurrence" in a limitation of liability clause in a liability policy refers, not to the cause of the occurrence or to the effect, but to the event that triggered liability.
Washington , 62 So.3d at 180-81.
Lloyd's suggests that the appropriate test for resolving this issue is whether a "reasonable observer" would perceive that sufficient "time and space" separate the impacts, thus resulting in separate and distinct accidents. On the other hand, Darwin suggests that the primary factor courts should consider to resolve this issue is whether the insured driver maintained control of his vehicle between the impacts. Our review of Louisiana jurisprudence reveals that although courts have relied upon factors such as "time and space" and "control" between impacts to resolve this issue, no Louisiana court has expressly adopted either of these tests, or any of the three tests identified by the Court in Washington , as controlling. See generally , 64 A.L.R.4th 668.
We conclude that the appropriate manner in which to resolve the question of whether there is one accident or multiple accidents in these multiple-impact automobile collisions is application of the "causation" theory. We reach this conclusion by considering the purpose of the insured's liability coverage and the specific provisions of coverage in the policy, in order to ascertain the intent of the contracting parties as to the extent and applicability of that coverage.
The purpose of liability insurance is to provide coverage for the insured tortfeasor for his fault that causes injury to others. Policy limit provisions in the Darwin policy provide, however, that coverage is limited to $1,000,000 for each occurrence, which is defined as an "accident," regardless of the number of others that sustain injury as a result of that accident. Additionally, aggregate policy limitations provide that coverage during a single policy period is limited to $2,000,000. These provisions clearly contemplate that the insured tortfeasor may be involved in multiple accidents during the policy period, for which he will be afforded coverage up to the aggregate limit of $2,000,000. Therefore, if an insured tortfeasor engages in negligent conduct which results in injury to others, and on a completely separate occasion during the policy period engages in a separate and distinct act of negligence that causes injury to others, he will be afforded coverage for both accidents up to the aggregate policy limit. We see no rational basis, in a multiple-impact automobile collision where the two collisions occur in such quick succession that they are arguably one accident that this same result would not apply, provided that the insured tortfeasor has engaged in a distinct, intervening act of negligence between the impacts, such that there is a different cause for the subsequent impact.[7]
A succinct description of the "causation" theory is found in the case of United Services Automobile Assn. v. Baggett , 209 Cal.App.3d 1387, 258 Cal.Rptr. 52 (6th App. Dist. 1989), wherein the Court stated:
In determining whether, under a particular set of circumstances, there was one accident or occurrence, the so-called 'causation' theory is applied. Hence a single uninterrupted course of conduct *718 which gives rise to a number of injuries or incidents of property damage is one 'accident' or 'occurrence.' On the other hand, if the original cause is interrupted or replaced by another cause, then there is more than one 'accident' or 'occurrence.'
Baggett , 209 Cal.App.3d at 1393, 258 Cal.Rptr. 52 (citations omitted).
Under this theory, an insured tortfeasor will be limited to a single policy limit for a single accident in situations where all of the successive impacts are the result of the same cause as the initial impact, rather than the result of different causes. In effect, the multiple-impact collision is a single and continual unbroken chain of events, uninterrupted by any new and distinct, intervening cause. Conversely, in situations where the insured tortfeasor engages in a distinct, intervening act of negligence between the impacts, such that the successive impact results from a different cause than the first impact, then there are separate accidents for which the insured tortfeasor will be afforded coverage with separate policy limits. In our view, adoption of the "causation" theory comports with the contracting parties' intentions regarding coverage under the policy.
Although we have stated our rationale for adopting the "causation" theory, we also find it important to state our reasoning for rejecting the "time and space" test proposed by Lloyd's. Contrary to Lloyd's contention that a "time and space" test would be more objective, and "clear and easy to apply," we find that use of a "time and space" test would be more subjective on the part of courts using the test and would lead to arbitrary results from case to case. More importantly, use of such a test would not resolve the crucial question of what transpired between the two impacts as it relates to the conduct of the driver whose insurance coverage is at issue, i.e. , did the driver engage in some distinct, intervening act of negligence between the two collisions such that the second collision resulted from a different cause than the first collision?
In adopting the "causation" theory, we do not suggest that "time and space" and "control" between impacts are irrelevant; to the contrary, we find that these are important factors for any court, when faced with this issue, to consider in evaluating whether the evidence supports a conclusion that the successive impacts are the result of a single cause or multiple causes. The more time and space between impacts, the more likely a court is to find that there are two accidents. Likewise, the more apparent it is that a driver did not regain control of his vehicle after a first impact, the less likely a court will be to find that he engaged in a distinct, intervening act of negligence that constitutes a different cause for the successive impact.
Our review of the facts of similar Louisiana cases that have addressed the issue before us reveals that examination of factors of "time and space" and "control" are useful to assist a court in its ultimate determination of whether multiple-impact collisions were the result of "one cause."
In Washington , supra , the driver of an 18-wheeler, while attempting to retrieve his dropped cell phone, crossed the center line of the highway, overcorrected and lost control of his vehicle, which turned over and slid on its side. The truck turned over onto one vehicle, seriously injuring that driver, and, while continuing to slide on its side, struck a second vehicle a few car lengths behind the first, instantly killing the driver. Washington , 62 So.3d at 175. After a thorough review of prior jurisprudence addressing the coverage issue in multiple-impact collision cases, including cases that discussed "time and space" and "control," the Washington Court appeared *719 to base its finding of a single accident on the fact that the two impacts occurred "almost simultaneously, resulting in a single accident under the facts ..." Id. at 184. Although not expressly adopting a "time and space" test, the Court did place emphasis on the timing of the two impacts. However, we note that under the facts of this case, it is clear that the driver had no control of his vehicle from the moment it overturned and therefore clearly did not engage in a distinct, intervening act of negligence that caused the second impact. There clearly was but one cause of both impacts. Thus, application of the "causation" theory to the facts of that case would lead to the same result.
In Liberty Mut. Ins. Co. v. Rawls , 404 F.2d 880 (5th Cir. 1968), the Court determined that there were two accidents where the insured tortfeasor, while being pursued at a high rate of speed by two deputy sheriffs, struck the left rear of one vehicle, continued on, veered across the centerline, and collided head-on with a second vehicle. The Court noted "time and space" factors (that the second collision occurred two to five seconds after and 30 to 300 feet apart from the first), but also noted that the insured tortfeasor had control of his vehicle after the initial collision, in reaching its conclusion of two accidents. Under the facts of that case, we note that a driver who maintains control of his vehicle after a first collision, yet continues at a high rate of speed and crosses the centerline, colliding with another vehicle head-on, clearly has engaged in a distinct, intervening act of negligence that causes the second accident. Thus, application of the "causation" theory to the facts of that case would lead to the same result.
In Amberge v. Lamb , 849 F.Supp.2d 720 (E.D. La. 2011), a highly intoxicated driver rear-ended a vehicle on the interstate, then, as both vehicles continued to drive forward, switched lanes and rear-ended the same vehicle a second time "thirty seconds to two minutes after the first collision." Id. at 721. After the intoxicated driver exited the interstate at the next interchange, the other driver passed the exit and pulled onto the shoulder of the road. The intoxicated driver then re-entered the interstate, pulled onto the shoulder in front of the other vehicle, put his vehicle in reverse and backed into the other vehicle. The driver of the other vehicle attempted to escape by exiting the interstate at the next interchange; however, the intoxicated driver followed the other vehicle and struck it in the rear one last time. Id. at 721-22.
The Court, in finding that there were four separate accidents, stated that "... the element of 'control' is essential to determining whether there was a single accident or more. Where a person loses control of the trajectory of his vehicle and strikes more than one person or vehicle, a court is more likely to find only one accident." Id. at 725 (citation omitted). Under the facts of that case, despite the fact that the intoxicated driver claimed to not remember the incident, he clearly "... was in control of the vehicle enough to make deliberate decisions about how and where to drive it, "and" ... seemed to deliberately target [the other] vehicle." Id. at 726. We note that a driver who maintains control of his vehicle after a first collision such that he makes deliberate decisions about how and where to drive it, and continues to operate that vehicle while intoxicated, repeatedly running into another vehicle, has engaged in distinct, intervening acts of negligence between the successive impacts, such that there are separate causes of each impact. Thus, application of the "causation" theory to the facts of that case would lead to the same result.
*720 Lloyd's relies heavily upon the First Circuit case of Miley , supra , as indistinguishable from the case before us. We find the Miley case to be clearly distinguishable. In Miley , the insured tortfeasor was engaged in a "controlled burn" on a tract of land adjacent to an interstate. The smoke from the burn drifted over the highway and resulted in two separate accidents 15 minutes and two-tenths of a mile apart, each accident involving completely different vehicles, none of which were operated by the insured tortfeasor. Miley , 645 So.2d at 1167. Because the insured tortfeasor, whose conduct and insurance coverage is at issue, was not operating a vehicle that was involved in multiple successive impacts, we do not view Miley as a case involving a multiple-impact automobile collision. We find the Miley case clearly distinguishable and not applicable to the analysis of the case before us.[8]
A further example of the application of both the "space and time" and "control" factors is found in the case of Illinois Nat'l Ins. Co. v. Szczepkowicz , 185 Ill.App.3d 1091, 134 Ill.Dec. 90, 542 N.E.2d 90 (1st Dist. 6/30/89), in which the driver of an 18-wheeler pulled across a fog-shrouded four-lane highway and stopped while still blocking the two northbound lanes. After being struck by a first vehicle, the driver, who was not incapacitated and was obviously aware of the dangerous position of his stopped but otherwise operable vehicle, failed to move his vehicle, which was then struck by a second vehicle five minutes later.
The distance between impacts apparently was not a factor in the Court's determination because the tortfeasor's vehicle had only moved forward 12 feet between impacts. However, time was clearly an important factor in the Court's determination that the tortfeasor had the opportunity between impacts to assess the continuing dangerous situation and take corrective action to avoid further impacts, but failed to do so, resulting in a second collision. Hypothetically, if the second impact had occurred more quickly after the first collision, such that the tortfeasor did not have the opportunity between collisions to take corrective action, it is more likely, based solely on the factor of time, that the Court would have found that there was only one accident, rather than two.
More importantly, the Court found that because the driver had both the ability and the opportunity to move his vehicle prior to the second impact, he was in "control" of his vehicle.[9] Although the Court also relied upon the "continuous or repeated exposure to substantially the same conditions" provision of the insurance policy, which we decline to do here, the Court stated that "the circuit court correctly adopted the 'cause' theory," and found that the tortfeasor's failure to move his vehicle from the travel lanes was a separate negligent act and "constituted a *721 separate cause of the second collision," different from the cause of the first collision. The Court therefore determined that there were two accidents. Id. , 134 Ill.Dec. 90, 542 N.E.2d at 93.
We now turn to a review of the facts of the case before us. Mr. Hyde maintains that from the moment of the initial impact with the Riggio vehicle his airbag deployed and rendered him unconscious.[10] He therefore maintains that he had no control of his vehicle after the initial impact and that there was but one cause of all of the successive impacts. Lloyd's counters that adoption of such a test to determine the number of accidents would be completely subjective on the part of the insured tortfeasor, and further implies that it would depend upon his self-serving statements.
We first note that because the issue before us is the extent of Mr. Hyde's insurance coverage, not his liability for all of the injuries that he caused in each of the collisions, a statement that he had no control of his vehicle throughout the incident, rather than serving Mr. Hyde's interest, would actually provide him with less insurance coverage from Darwin, while not exculpating him from liability for any of the impacts and resulting injuries. We therefore do not find such a statement to be self-serving. Furthermore, we disagree with Lloyd's assertion that a "causation" test would require a purely subjective evaluation of Mr. Hyde's intent. To the contrary, an examination of the physical evidence and eyewitness accounts from the collisions will assist us in determining whether there was only one cause for all of these successive collisions.
Although Lloyd's argues for adoption of a "time and space" test, it never affirmatively states either the time that elapsed from the initial impact with the Riggio vehicle until the final impact with the Knoten vehicle, nor the distance between those two impacts. However, we can ascertain from the mile-post demarcations in the police reports, with no countervailing evidence, that the distance between these two impacts was approximately nine-tenths of a mile. Additionally, using this information regarding distance, and the uncontroverted evidence from the eyewitness accounts and the police reports that Mr. Hyde was traveling no less than 60 miles per hour throughout this incident, we can further ascertain that the entire incident lasted approximately one minute. It is with these parameters in mind that we consider Lloyd's suggestion that Mr. Hyde's contention that he was unconscious throughout the incident is suspect.
We note that neither the police reports nor the eyewitness accounts indicate any evidence of braking on the part of Mr. Hyde. To the contrary, all of the evidence indicates that Mr. Hyde's vehicle maintained its speed of approximately 60 to 70 miles per hour throughout this incident. We also note the configuration of the roadways involved as shown in the police reports. The first two impacts occurred in the right lane of an elevated expressway immediately before a right-exit down ramp leading to the ground elevation. The diagram in the second police report shows that there are bridge rails on each side of the down ramp, which in effect act as retaining walls, and that Mr. Hyde's vehicle struck those rails at least twice. The *722 diagram in the third police report indicates that the down ramp is angled directly toward the intersection of the service road and Avenue D where Mr. Hyde's vehicle struck Ms. Knoten's vehicle in the final impact. Additionally, we note that the narrative in the third police report indicates that due to the severity of the injuries of the victims, blood was voluntarily drawn from Mr. Hyde for chemical testing for intoxication. Trooper Cedric Skinner, who prepared the third police report, indicated in his deposition that those tests were negative for any intoxicating substances, thus eliminating intoxication as a potential explanation for Mr. Hyde's failure to stop after the initial impact. Both Trooper Damian Lafonta, who prepared the first police report, and Trooper Skinner maintained in their depositions that the facts of these collisions were consistent with a driver who was unconscious throughout the incident.
Although Lloyd's complains of its inability to produce evidence of Mr. Hyde's condition or conduct inside of his vehicle during this incident, it completely disregards all of the evidence which directly supports Mr. Hyde's contention that he was rendered unconscious after the initial impact. We agree with the opinions of Troopers Skinner and Lafonta and find that this evidence makes it highly probable that Mr. Hyde was rendered unconscious by the initial impact; was then directed into the contained down ramp by striking the right side of Ms. Patai's vehicle; was then funneled by the downslope of the contained down ramp, along with the forward momentum of his vehicle at a high rate of speed, directly to the intersection where, without braking, his vehicle violently struck Ms. Knoten's vehicle. Furthermore, we do not find Mr. Hyde's claim of being unconscious during this incident to be suspect, simply because this incident lasted one minute and happened over a distance of nine-tenths of a mile. To the contrary, absent any other explanation, we find it to be the only rational explanation for this very unique incident.
Upon our de novo review, Lloyd's provides no evidence to contradict Mr. Hyde's claim, supported by the evidence outlined herein, that he was rendered unconscious upon the first impact with the Riggio vehicle. We therefore find no genuine issue of material fact that Mr. Hyde was rendered unconscious by the initial impact, was not in control of his vehicle after the initial impact, and did not engage in any distinct, intervening acts of negligence between any of the successive impacts. Applying the "causation" theory, we find that there was only one cause for all of these impacts and consequently, only one accident. Accordingly, Darwin is entitled to summary judgment as a matter of law. We therefore affirm the judgment of the trial court granting summary judgment in favor of Darwin and denying summary judgment to Lloyd's.
CONCLUSION
For the reasons stated above, we affirm the judgment of the trial court granting summary judgment in favor of Darwin National Assurance Company and denying summary judgment to Lloyd's Syndicate 1861.
AFFIRMED

Although the exit ramp from the elevated expressway is designated as the Barataria Boulevard exit, the first intersection that a vehicle exiting the down ramp encounters after exiting is the Avenue D intersection.

Three separate police reports were prepared regarding this incident: one for the impact with the Riggio vehicle; a second for the impact with the Patai vehicle; and a third for the impact with the Bonds and Knoten vehicles.

Mr. Hyde's primary auto insurer, Geico, pursuant to its policy, treated the loss as three separate accidents and paid the maximum aggregate limit for its policy.

In support of its motion for summary judgment, Darwin introduced copies of its insurance policy, the original and amended petitions for damages in the Vicks lawsuit, excerpts of the depositions of Mr. Hyde and the three officers who prepared the accident reports, the three accident reports relating to this incident, and Lloyd's petition for damages. In support of its motion for summary judgment, Lloyd's also introduced copies of the three accident reports relating to this incident.

Although the extent and seriousness of injuries and damages caused by an accident may not manifest themselves until sometime after the end of the harm-producing violence itself, the genesis of those injuries and damages nevertheless occurs during the active harm-producing violence.

We stress that the issue before a court in this circumstance is not the insured tortfeasor's liability for all of the damages caused by his fault; rather, the issue is the extent of coverage provided to him under the applicable policy of insurance. We also note that this issue will only arise in cases where there are multiple impacts that are separated by some time and space such that an argument can be made that there are separate accidents, and the total sum of all damages sustained during the incident due to the insured tortfeasor's fault is arguably greater than the policy limit for a single occurrence.

Although a successive impact that constitutes a separate accident may be the result of a different cause that does not arise from any fault of the initial tortfeasor, because the issue before us involves the extent of coverage under the initial tortfeasor's insurance policy, we concern ourselves in this opinion only with intervening acts of negligence of the insured tortfeasor.

Although we have stated that we agree with the Miley Court that the phrase "including continuous or repeated exposure to conditions" does not apply to multiple-impact automobile collisions, we do not view Miley as a multiple-impact automobile collision case because the insured tortfeasor in that case was not operating a vehicle that was involved in multiple successive impacts.

Sufficient "control" may come in different forms: it may be the successful recovery from the initial impact while the vehicle is still in motion, such that the tortfeasor is able to purposefully direct the forward motion of his vehicle safely to avoid further collisions; or it may be the ability and opportunity of a tortfeasor, who is not otherwise incapacitated from the initial impact, to remove his stopped vehicle from a dangerous position, provided the vehicle is otherwise operable, to a safe position. See Szczepkowicz , supra .

Although the police reports contain speculation that Mr. Hyde might have blacked-out prior to the first collision due to a medical condition, that scenario is directly contradicted by Mr. Hyde's assertion that he was rendered unconscious by the deployment of his airbag during the first collision. In any event, the relevant fact is that Mr. Hyde was rendered unconscious at the point of the initial collision, regardless of the reason for that unconsciousness.