STARR SURPLUS LINES INSURANCE
COMPANY AND LEXINGTON INSURANCE
COMPANY

VERSUS

BERNHARD MCC, L.L.C., ET AL

NO. 20-C-78

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPLICATION FOR SUPERVISORY REVIEW FROM THE
TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 781-441, DIVISION "K"
HONORABLE ELLEN SHIRER KOVACH, JUDGE PRESIDING

December 02, 2020

**ROBERT A. CHAISSON**
**JUDGE**

Panel composed of Judges Marc E. Johnson,
Robert A. Chaisson, and Stephen J. Windhorst

**WRIT GRANTED; JUDGMENT VACATED; SUMMARY JUDGMENT**
**RENDERED**
    **RAC**
    **MEJ**
    **SJW**

COUNSEL FOR PLAINTIFF/RESPONDENT,
STARR SURPLUS LINES INSURANCE COMPANY AND LEXINGTON
INSURANCE COMPANY
        Maura Z. Pelleteri
        Amy S. Malish
        G. Benjamin Ward

COUNSEL FOR DEFENDANT/RELATOR,
BERNHARD MCC, L.L.C.
        Michael R.C. Riess
        Michael D. Lane
        Robert C. Riess

COUNSEL FOR DEFENDANT/RESPONDENT,
TRAVELERS INDEMNITY COMPANY
        Erin Sayes Kenny

CHAISSON, ROBERT, J.

In this case concerning disputed insurance coverage for damages resulting from a construction-site accident, defendant-relator, Bernhard MCC, L.L.C. ("BMCC"), seeks supervisory review of the trial court's denial of its motion for summary judgment against Starr Surplus Lines Insurance Company ("Starr Surplus") and Lexington Insurance Company ("Lexington"). Pursuant to La. C.C.P. art. 966(H), this case was assigned for briefing and the parties were permitted an opportunity for oral argument.

Upon our *de novo* review, we find that there are no genuine issues of material fact and that BMCC is entitled to judgment as a matter of law. Accordingly, we grant this writ application, vacate the judgment of the trial court and render summary judgment in favor of BMCC, dismissing Starr Surplus' and Lexington's claims against BMCC with prejudice.

**BACKGROUND**

This case arises out of an accident which occurred on March 10, 2017, during the redevelopment of the Jung Hotel located at 1500 Canal Street in New Orleans, a construction project which began in December of 2014. The owners of the hotel, Jung L.L.C. ("Jung"), retained The McDonnel Group ("TMG") to provide general contracting services for the project. The contract between Jung and TMG, (referred to generally as the "Prime Contract") sets forth various provisions concerning the procurement of property insurance for the duration of the construction project to protect the parties' interests.

In February of 2015, TMG purchased comprehensive "all-risk" property insurance policies from Starr Surplus and Lexington (Policies Nos. 207 86 707 and SLSTCON 11024415, respectively), which insured against all risk of direct physical loss of or damage to the building during the project. These virtually identical policies are generally referred to as the builder's risk policies.

1

In April of 2015, TMG entered into Subcontract No. 171310-17 with BMCC to provide plumbing and HVAC work on the project (BMCC, with the consent of TMG, was assigned this subcontract from the original contracting party, MCC). By its terms, this subcontract required BMCC to purchase commercial general liability (CGL) insurance with coverage for personal injury, advertising liability, contractual liability, and completed operations coverage, to remain in force for a period of at least five years from the date of the completion of the contract. In August of 2016, BMCC purchased a CGL policy from Travelers Indemnity Company ("Travelers"), Policy No. VTC2K-CO-5468B485-IND-16.

It is undisputed by the parties that sometime on March 20, 2017, while BMCC was conducting a test of the water supply line on the third floor, water escaped and leaked into the boiler room and into floors below causing water damage to the property, including an electrical bus located on the second floor. That same day, TMG submitted a notice of claim to Starr Surplus and Lexington pursuant to the builder's risk policies. BMCC also submitted a notice of claim to Travelers.

On August 22, 2017, TMG provided Starr Surplus and Lexington with a partial proof of loss for damages relating to the water intrusion. The insurers found the accident to be an insured event for which the policy provided coverage and proceeded to pay TMG $400,000 for the damages sustained, with the understanding that further damages may be paid upon additional proof of loss. Per these builder's risk policies, TMG's insurance claim is subject to a $50,000 deductible.[1] Following the $400,000 payment, TMG purportedly assigned to Starr Surplus and Lexington its rights to recover payment of its deductible from BMCC, which purportedly arise from the Subcontract between TMG and BMCC.

---

[1] There is a $25,000 deductible on both the Starr Surplus and Lexington policies.

2

Travelers made no payments to any parties pursuant to the CGL policy issued to BMCC.[2]

On March 10, 2017, Starr Surplus and Lexington filed a petition for damages wherein they allege that as a result of their payment of the claim and TMG's assignment of rights, they are legally and conventionally subrogated to the rights of TMG to recover damages from responsible persons.[3] They allege that BMCC was negligent in multiple ways in the manner in which it conducted the March 10 water test. They also allege a claim of "insurance coverage" against Travelers wherein they allege that the Travelers policy is primary and should have covered the damages sustained by the water accident prior to any insurance coverage by Starr Surplus and Lexington. Starr Surplus and Lexington seek as damages the $50,000 policy deductible, the $400,000 paid to TMG, and any additional damages which may accrue for further proof of loss relating to the accident.

Both BMCC and Travelers filed answers to the petition largely denying the allegations set forth by plaintiffs and raising multiple affirmative defenses. In February of 2019, BMCC filed a motion for summary judgment which included copies of the various documents and policies in question attached as exhibits to the memorandum. Travelers also filed a motion for summary judgment in which it adopted all of the arguments made by BMCC in its motion and made additional legal arguments. Following a hearing at which the judge considered both motions, the trial court, on November 27, 2019, issued a judgment denying both motions.[4]

---

[2] It is not clear from the writ application whether a proof of loss was submitted to Travelers.

[3] Subrogation allows someone, often an insurer, who has paid a loss to step into the shoes of the injured party or its insured and assert the injured party's or insured's rights against a third party who is allegedly responsible for the loss, and thereby be reimbursed for the payment. A party to a contract can, however, waive its, and usually its insurer's, right of subrogation through an express contractual provision. 2006 A.L.R.6th 14 ("Validity, Construction, and Application of Contractual Waiver of Subrogation"). Subrogation is defined in La. C.C. art. 1825 as "the substitution of one person to the rights of another."

[4] Both BMCC and Travelers filed notices of intent to seek supervisory writs; however, by the date of the extended writ deadline, only BMCC had filed a supervisory writ with this Court.

BMCC raises two assignments of error. First, the trial court erred in denying summary judgment as a matter of law because Starr Surplus and Lexington have no right of subrogation because the named insured on the Starr Surplus/Lexington builder's risk policies, TMG, waived subrogation rights against BMCC. Second, the trial court erred as a matter of law because BMCC is an additional insured under the builder's risk policies.

**DISCUSSION**

Appellate courts review summary judgments *de novo* using the same criteria that govern the trial court's determination of whether summary judgment is appropriate. *O'Krepki v. O'Krepki*, 16-50 (La. App. 5 Cir. 5/26/16), 193 So.3d 574, 577. A motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966; *Semco, LLC v. Grand Ltd.*, 16-342 (La. App. 5 Cir. 5/31/17), 221 So.3d 1004, 1031 (citing *Oubre v. Louisiana Citizens Fair Plan*, 11-0097 (La. 12/16/11), 79 So.3d 987, 1002-03). There are no genuine issues of material fact in this case. Rather, the parties' disputes concern questions of law, including the interpretation of construction contracts and insurance contracts to ascertain the rights and obligations which exist between the various parties involved in this construction project. Such legal questions are properly resolved on a motion for summary judgment. *Lloyd's Syndicate 1861 v. Darwin Nat'l Assurance Co.*, 17-623 (La. App. 5 Cir. 5/23/18), 248 So.3d 709, 714.

*Waiver of Subrogation*

---

In the absence of Travelers, we decline to address any arguments concerning Starr Surplus and Lexington's claims against them under the Direct Action Statute.

4

Because Starr Surplus and Lexington, in their petition for damages against BMCC, claim to be standing in the shoes of TMG, the general contractor on the project, we begin our analysis with an examination of the rights and obligations of TMG. It is well settled in Louisiana law that a subrogee can have no greater rights than those possessed by its subrogor and is subject to all limitations applicable to the original claim of the subrogor. *Certified Cleaning & Restoration, Inc. v. Lafayette Ins. Co.*, 10-948 (La. App. 5 Cir. 5/31/12), 96 So.3d 1248, 1251. An analysis of the rights of TMG includes not just an examination of the rights set forth in the subcontract between TMG and BMCC, but also the rights and obligations of TMG under the Prime Contract between TMG and Jung, the property owner.

The Prime Contract between Jung and TMG for the renovation is AIA Document A102-2007, a widely-used standard form construction contract.[5] In the Prime Contract, TMG agreed to provide construction services and materials to the owner, Jung, for a guaranteed maximum price of $76,086,883. Article 7 of the contact enumerates various costs of work the owner is required to pay the contractor. Notably, Article 7.7.3 states that the owner shall pay the contactor the costs of repairing or correcting damaged or nonconforming work executed by the contractor, subcontractors, or suppliers, *provided* that such damaged or nonconforming work was not caused by negligence *and* only to the extent that the cost of repair or correction is not recovered by the contractor from insurance. Article 8.1.5 reiterates that costs due to negligence or failure of subcontractors is a cost not to be reimbursed by the owner. Article 17, the last in this agreement and just before the signature block, requires the contractor, TMG, to purchase

---

[5] The AIA (American Institute of Architects) promulgates a variation of this contract every decade (the most current version is A102-2017) and, as an industry standard, it is used in construction projects all over the country. Some of the terms and provisions in the contract have changed very little over the many decades since the contract was first published; as a consequence of this, and the contract's widespread usage as an industry standard, there has been extensive judicial and scholarly analysis of its terms and provisions.

insurance and bonds as required by the provisions set forth in Article 11 of AIA Document A201-2007, General Conditions for the Contract of Construction. This companion document to A102, which is explicitly incorporated on the first page of A102, sets forth the general conditions of the contract. As specified in A201, the "contract" between Jung and TMG consists of both the agreement set forth in A102, the general conditions of A201, and other drawings and documents. A201 details many of the rights and responsibilities of the various participants in a large construction project, including the owner, contractor, architects, and subcontractors. Article 11 sets forth the insurance requirements for contractor's liability insurance, owner's liability insurance, property insurance, boiler and machinery insurance, loss of use insurance, waivers of subrogation, and performance bonds.

Specifically, Article 11.3 requires the purchase of "all-risk" property insurance (commonly referred to as builder's risk insurance) to be in effect until the last payment on the Prime Contract is made or until no person or entity other than the owner has an insurable interest in the property, whichever is later. The property insurance "shall" include the interests of the owner, the contractor, subcontractors, and sub-subcontractors in the project. The required "all-risk" policy is to provide coverage against the perils of fire and physical loss or damage, theft, vandalism, malicious mischief, collapse, earthquake, flood, windstorm, falsework, testing and startup, temporary buildings and debris removal. While A201 originally contemplates the owner as the purchaser of the property insurance, it does specifically allow for the contractor to purchase the required insurance that will protect the interests of the contractor, subcontractors and sub-subcontractors and charge that cost to the owner. TMG and Jung did opt for this in their signed A102 Agreement. Notably, Article 11.3.1.3 states "[i]f the property insurance

6

requires deductibles, the Owner shall pay costs not covered because of such deductibles."

Because the waiver of subrogation is an essential part of the relator's argument, Article 11.3.7 is reproduced here in its entirety:

> **The Owner and Contractor waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other**, and (2) the Architect, Architect's consultants, separate contractors described in Article 6, if any, and any of their subcontractors, sub-subcontractors, agents and employees, **for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to this Section 11.3 or other property insurance applicable to the Work**, except such rights they have to proceeds of such insurance held by the Owner as fiduciary. The Owner or Contractor, as appropriate, shall require of the Architect, Architect's consultants, separate contractors described by Article 6, if any, and the subcontractors, sub-subcontractors, agents and employees of any of them, by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. **A waiver of subrogation shall be effective as to a person or entity even though that person would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.**[6]
> (Emphasis supplied)

The language set forth here is known as a mutual waiver of subrogation. The purpose behind such a wavier is to assure that, in instances of losses covered by the policy, the insurer is to bear the risk of loss regardless of any fault on the part of the identified parties, as well as to prevent a potential windfall to the insurer subrogated to the rights of an insured against other parties to the contract.[7] Given the complexity of construction projects, which may involve many parties whose

---

[6] For general analysis of this particular AIA provision, see Bruner & O'Connor Construction Law § 5:235 (BOCL §5:235). According to that legal treatise, this AIA provision applies expressly to subcontractors, and therefore subcontractors are protected from subrogation actions by virtue of this clause.

[7] Few Louisiana courts have addressed mutual waivers of subrogation in the context of construction projects, but the issue has been addressed by courts in other jurisdictions. In *School Alliance Ins. Fund v. Fama Const. Co.*, a New Jersey court, after analyzing nearly identical mutual waiver of subrogation language from a previous iteration of an AIA contract, found in favor of the subcontractor against the insurer which issued the builder's risk property insurance policy for a school construction project. *Sch. All. Ins. Fund v. Fama Const. Co.*, 353 N.J.Super. 131, 140, 801 A.2d 459, 464 (Law. Div. 2001); *see also Chadwick v. CSI, Ltd.*, 137 N.H. 515, 517, 629 A.2d 820, 822 (1993).

work creates an insurable interest in the project, shifting the risk of property losses to an insurer is desirable to prevent disputes between the parties working on the project during the course of construction.[8]

The only higher court in Louisiana to have considered this waiver of subrogation provision contained in an AIA construction contract is the First Circuit Court of Appeal in *Gray Ins. Co. v. Old Tyme Builders, Inc.*, 03-1136 (La. App. 1 Cir. 4/2/04), 878 So.2d 603, 604, *writ denied*, 04-1067 (La. 6/18/04), 876 So.2d 814. The factual circumstances in Gray are similar to the case *sub judice*.

The property owner and general contractor signed a standard form AIA contract. Prior to the issuance of a certificate of completion on the project, it was discovered that the subcontractor responsible for installing a metal lathe system, Old Tyme Builders, Inc., had performed defective or negligent work which caused rainwater to infiltrate the interior of the building causing damage to walls and carpets. The subcontractor corrected its work; the general contractor bore the initial expense for the consequential damages such as carpet cleaning and wall replacement. The general contractor's insurer, Gray Insurance Company, paid for these consequential damages pursuant to the policy obtained by the general contractor. Gray, acting as subrogee to the rights of its insured, the general contractor, filed a petition for damages against Old Tyme Builders and its insurer to recover the damages paid pursuant to the policy. Old Tyme Builders and its insurer filed a motion for summary judgment contending that the waiver of

---

[8] It is worth noting as well, for the purposes of this case, that this mutual waiver of subrogation is not applicable to all claims which may arise during the course of a construction contract, but only those which may arise from accidents and perils covered under the builder's risk property insurance policy. The builder's risk policy is a first-party insurance policy which allows the insured to make a claim against the insurer for damage caused by a covered peril or risk. An all risk policy covers all risks to a particular property except for those specifically excluded in the policy. Commercial general liability (CGL) insurance is a third-party insurance policy which allows parties not privy to the insurance contract to make a claim on the insurance for damages caused by the insured's actions or conduct. In the context of a construction insurance case, this may include negligent injury to a passer-by at the worksite or damage to property adjacent to the construction site. Such third-party claims would not be covered under the builder's risk policy and would not be subject to this waiver of subrogation.

subrogation in the AIA standard form contract between the owner and the general contractor precluded recovery by Gray. The trial court granted the motions for summary judgment and dismissed Gray's claims with prejudice.

In its decision affirming the decision of the trial court, the First Circuit examined the waiver of subrogation provision in the contract between the owner and general contractor, the language of which is identical to the language in the Prime Contract between Jung and TMG. The court began its analysis by observing:

> A subrogee acquires no greater rights than those possessed by its subrogor and is subject to all limitations applicable to the original claim of the subrogor. *Travelers Ins. Co. v. Impastato,* 607 So.2d 722, 724 (La. App. 4 Cir. 1992); *State v. U.S. Fidelity & Guar. Co.,* 577 So.2d 1037, 1039 (La. App. 4 Cir. 1991). Therefore, the fate of Gray Insurance Company's claim is dependent on the interpretation of the subrogation clause quoted above.

*Gray Ins. Co.*, 878 So.2d at 607.[9]

The court then proceeded to address arguments raised by Gray as to why the waiver of subrogation doesn't apply, including, most importantly for this case, the argument that the waiver did not apply because the general contractor agreed only to waive subrogation against the owner's subcontractors, not against its own. The court, using standard rules of interpretation of Louisiana insurance contracts, disagreed, and found that the language in the AIA contract "[c]learly … operates as a waiver of rights of the owner and the contractor against subcontractors and other workers on the project for property damage to the extent that such damages are covered by insurance. By these terms, the waiver of subrogation provisions are reciprocal, with no exception for claims by the owner or contractor against their own subcontractors." *Id.* The court proceeded to address Gray's other arguments (including one that Old Tyme Builders had waived the waiver of subrogation by

---

[9] See also *Certified Cleaning & Restoration, Inc. v. Lafayette Ins. Co.*, 10-948 (La. App. 5 Cir. 5/31/12), 96 So.3d 1248, 1251, for an instance of this Court citing *Gray* for this same principle of law.

9

correcting the work) not raised in the current case, and affirmed the decision of the trial court.

Starr Surplus and Lexington argue that the *Gray* case is inapplicable here, chiefly because Article 9.6 of the subcontract between TMG and BMCC "carves out an exception" for them to pursue rights they (standing in the shoes of TMG) may have under the CGL policy issued by Travelers to BMCC. This argument that the subcontract somehow supersedes the AIA Prime Contract entered into between TMG and Jung is not based on any case law or legal theory. This argument disregards the long standing principle of Louisiana law stated in *Gray* that the subrogee acquires no greater rights than those possessed by its subrogor and is subject to all limitations applicable to the original claim of the subrogor. Under the terms of the Prime Contract, TMG agreed to waive all claims against its subcontractors for damages caused by fire or other causes of loss covered by the builder's risk policies issued by Starr Surplus and Lexington. There's no dispute that the water damage which occurred was covered by these policies. TMG further agreed that its waiver would be effective as to a person or entity *even though* that person would otherwise have a duty of indemnification, contractual or otherwise. Therefore, any "carve outs" contained in the subcontract between TMG and BMCC are inapplicable in this case where the claims against BMCC arise out of damages covered in the builder's risk policies. To hold otherwise would defeat the purpose of the mutual waiver provision found in the AIA Prime Contract, which is to shift the burden of loss for accidents causing damage to property during construction from the contractors to insurers.

Accordingly, we find as a matter of law that the mutual waiver of subrogation provisions found in the Prime Contract signed by TMG, the subrogor, preclude Starr Surplus and Lexington, the subrogees, from bringing claims against

BMCC, the subcontractor, for the recovery of damages caused by a risk of loss covered by the builder's risk policy.

This finding is consistent with the terms of the builder's risk policy issued by Starr Surplus and Lexington to TMG. The general conditions of the completed value all risks construction policy issued by Starr Surplus and Lexington include the following provision:

> 10. <u>SUBROGATION</u>
>
> If the Company pays a claim under this policy, it will be subrogated, **to the extent of such a payment**, to all the insured's rights of recovery from other persons, organizations and entities. The insured will execute and deliver instruments and papers and do whatever else is necessary to secure such rights.
>
> **The Company will have no rights of subrogation against:**
>
> **A.**    Any person or entity, which is a Named Insured or an Additional Insured;
>
> **B.**    **Any other persons or entity, which the insured has waived its rights of subrogation against in writing before the time of the loss** …
>
> (Emphasis supplied)

As we found above, TMG waived its rights of subrogation against its subcontractors in the Prime Contract. Starr Surplus and Lexington, by the express language in their own policies, have no right of subrogation against BMCC.

*Additional Insured Status*

We turn next to the question of whether BMCC is an additional insured under the builder's risk policy.

In its argument regarding BMCC's status as an additional insured, Starr Surplus and Lexington state that neither the Certificate of Insurance, nor any provision in the Prime Contract or Subcontract, mandated TMG to list its subcontractors as Additional Insureds. This argument misleadingly conflates the obligations between the parties (the owner and the contractor and the contractor and subcontractors) with the actual provisions of the insurance policies issued.

11

The place to look to determine whether BMCC has been named as an additional insured is the actual insurance policies themselves.

With regard to additional insureds, the policy specifically states:

B. ADDITIONAL INSURED(S):

To the extent required by any contract or subcontract for an Insured Project, and then only as their respective interests may appear, all owners, all contractors, and subcontractors of every tier, tenants of the Insured Project, and any other individual entity specified, in such contract or subcontract are recognized as additional insureds hereunder.

Additional insureds as provided above shall be shown on ACORD Certificates of Insurance issued by Arthur J. Gallagher (insurance broker), copies of which will be forwarded to this company and kept on file.[10]

An insurance policy is a contract between the parties and should be construed using the general rules of interpretation set forth in the Civil Code. *Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 93-0911 (La. 1/14/94), 630 So.2d 759, 763. An insurance policy should not be interpreted in an unreasonable or strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion. *Id.* Applying these principles of interpretation, we find that BMCC is an additional insured under the builder's risk policy.

The terms of these policies are in accordance with a nearly universal rule of insurance known as the anti-subrogation rule. This rule, which is said to be in accord with the basic definition of subrogation as a right that arises only with respect to rights of the insured against third persons to whom the insurer owes no duty, holds that no right of subrogation can arise in favor of an insurer against its own insured. 16 Couch on Ins. § 224:1. The stated purpose of such a rule is to prevent a circumstance where allowing subrogation would permit an insurer, in effect, to pass the incidence of the loss, either partially or totally, from itself to its

---

[10] BMCC included a copy of such a certificate in its evidence on the motion for summary judgment.

12

own insured, and thus avoid the coverage which its insured purchased. *Taylor v. Bunge Corp.*, 845 F.2d 1323, 1329 (5th Cir. 1988); Couch §224:3.

The anti-subrogation rule is long established in Louisiana. In one case concerning an action by an insurer who issued a builder's risk policy for a construction project against a subcontractor who allegedly negligently caused a fire to break out, the Second Circuit Court of Appeal, citing the Louisiana Supreme Court case *Glens Falls Insurance Company et al. v. Globe Indemnity Company et al.*, 214 La. Sup. 467, 38 So.2d 139 (1948), noted "[t]he Supreme Court considered the rule too well established to require citation of authorities that an insurance company, which has paid a claim and taken a subrogation, has no right of action against a co-insured of the subrogor, even though the … loss may have been caused by the negligence of the co-insured, and provided, of course … that there is no design or fraud on the part of defendant." *Louisiana Fire Ins. Co. v. Royal Indem. Co.*, 38 So.2d 807, 810 (La. Ct. App. 2nd Cir. 1949).[11]

The attempt by a builder's risk insurer to recover the cost of the policy's deductible from a subcontractor who negligently caused a fire on a construction site, a risk covered under the insurance policy, was dismissed by the Second Circuit in *Olinkraft, Inc. v. Anco Insulation, Inc.*, 376 So.2d 1301, 1302 (La. App. 2 Cir. 1979) as contrary to the anti-subrogation rule.

Applying similar reasoning to the facts of this case, since the accident at the Jung construction site was a risk covered by the builder's risk policy (an undisputed fact because Starr Surplus and Lexington paid TMG's claim on the policy), and because BMCC is an additional insured on the builder's risk policy, then Starr Surplus and Lexington may not bring a suit against BMCC to recover amounts paid under the policy, or the deductible, because to do so would allow

---

[11] It is worth noting that nowhere in Starr Surplus' or Lexington's opposition materials do they address the well-established, above-mentioned legal principles that a subrogee may not gain rights greater than those of the subrogor or the anti-subrogation rule that prevents insurers from bringing actions in subrogation against their own insureds.

13

Starr Surplus and Lexington to pass the incidence of the loss, which the insurance policy was designed to cover, to the insured.

Starr Surplus' and Lexington's argument that BMCC was not an additional insured under the builder's risk policy is contrary to the aforementioned purpose behind the insurance provisions of the standard form AIA contract, which is to shift the risk of loss for damages to the property during the course of construction to the insurer and minimize disputes between the parties participating in the construction project. Additionally, had TMG and Starr Surplus/Lexington truly intended to cover only losses to property resulting from TMG's work and none of the subcontractors, then it could have simply left out or deleted the language concerning additional insureds and subcontractors of every tier from the builder's risk policy entirely.

Finally, Starr Surplus and Lexington argue that the language of the subcontract allows for the recovery of the deductible. Article 9.8 of the subcontract, states:

> 9.8 Subcontractor is responsible for all deductibles owed on any insurance policies for which a claim is made arising out of or in connection with the Subcontractor's Work or operations on the Project. Subcontractor agrees to review all policies and provide any supplemental insurance it deems necessary, including supplemental insurance to cover large deductibles of policies that may be provided by others.

In addition to being both overly broad and contrary to the language of the Prime Contract which states that deductibles on the builder's risk policy are to be paid by the owner, the fact that Starr Surplus and Lexington are attempting to enforce this contractual provision against one of its own insureds is contrary to the well-established rule of anti-subrogation as mentioned in the *Olinkraft* case, as well as the public policy rationale underlying that rule. TMG purportedly assigned its rights to the deductible to respondents upon the $400,000 payment to TMG under the builder's risk policy. Evidence of this assignment was not placed in the

14

record, and no mention is made of any other valuable consideration exchanged for this purported assignment.  Starr Surplus and Lexington are purely seeking to recover their "losses" paid out under the insurance contract from one of their own insureds.  The cases that they cite, none of which are from Louisiana courts, are not controlling or persuasive otherwise.  Accordingly, we find that Starr Surplus and Lexington may not recover the $50,000 deductible from BMCC, an additional insured on its own builder's risk policies.

CONCLUSION

Upon our *de novo* review, we find that there are no genuine issues of material fact and that BMCC is entitled to judgment as a matter of law.  Accordingly, we grant this writ application, vacate the judgment of the trial court and render summary judgment in favor of BMCC, dismissing Starr Surplus' and Lexington's claims against BMCC with prejudice.

**WRIT GRANTED;**
**JUDGMENT VACATED;**
**SUMMARY JUDGMENT RENDERED**

15

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

MARY E. LEGNON
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT
101 DERBIGNY STREET (70053)
POST OFFICE BOX 489
GRETNA, LOUISIANA 70054
www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**DECEMBER 2, 2020** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES
NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

**20-C-78**

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE ELLEN SHIRER KOVACH (DISTRICT JUDGE)
G. BENJAMIN WARD (RESPONDENT)            MICHAEL R.C. RIESS (RELATOR)

### MAILED
MICHAEL D. LANE (RELATOR)           AMY S. MALISH (RESPONDENT)          ERIN SAYES KENNY (RESPONDENT)
ROBERT C. RIESS (RELATOR)           MAURA Z. PELLETERI (RESPONDENT)     ATTORNEY AT LAW
ATTORNEYS AT LAW                    ATTORNEYS AT LAW                    POST OFFICE DRAWER 2471
1100 POYDRAS STREET                 1100 POYDRAS STREET                 BATON ROUGE, LA 70821
SUITE 1100                          SUITE 3300
NEW ORLEANS, LA 70163               NEW ORLEANS, LA 70163